Irene C. JENKINS, Plaintiff-Appellant,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 18757.

United States Court of Appeals, Sixth Circuit.

June 30, 1970.

Harvey L. Sproul, Lenoir City, Tenn., for plaintiff-appellant.

Edward E. Wilson, Asst. U. S. Atty., Knoxville, Tenn., for defendant-appellee; J. H. Reddy, U. S. Atty., Knoxville, Tenn., on brief.

Before PHILLIPS and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

We consider the appeal of Irene C. Jenkins from disallowance of her claim to social security benefits. Mrs. Jenkins was 57 years old in April of 1967— the time of the hearing in this case. She had worked for many years for the Union Carbide Company as a salad maker in the cafeteria. Her husband is also employed there; they have no de-

pendent children. Appellant claims that because of her disabilities[1] she quit work in April of 1966. In September of that year she retired from Union Carbide at a monthly pension of $57.00.[2]

Application for Disability Insurance Benefits filed June 27, 1966, describes the disabilities upon which she relied as "Diabetes, Ulcers, Bursitis," and stated that she had become disabled on April 1, 1966. Initially, the Secretary, after reviewing what was before him, denied her application. Upon request for reconsideration, the Social Security Administration reviewed the material before it. The Department on February 17, 1967, advised Mrs. Jenkins,

"You stated that you became unable to work in April 1966, at age 55, because of diabetes, ulcers and bursitis. Our records show that you have a sixth grade education and worked as a salad maker in a cafeteria.

"The medical evidence includes reports from your treating physican, hospital records and the results of special examinations which were arranged for you. This evidence reveals that you have a history of diabetes and ulcers. However, it is shown that these conditions are controlled by diet and medication and the state of your nutrition is not disturbed. Although you have recurrent attacks of bursitis, the evidence establishes that this condition responds to therapy and does not seriously limit your ordinary activities. We realize that you may experience occasional pain and discomfort. However, the evidence does not support a conclusion that your condition is so severe as to prevent you from performing your usual work. Therefore, the denial of your claim is affirmed."

Upon her request, a hearing was had before a trial examiner at which appellant was represented by counsel. Includ-ed in the record made in considering appellant's application were reports of her hospitalization on several occasions, reports of doctors who had examined her for the Secretary, and reports of her own treating doctor. Of the doctors who examined plaintiff and expressed views as to whether she was disabled, the following were the observations of such of them as examined her at the request of the Secretary.

On September 7, 1966, Dr. I. Reid Collmann concluded:

"Recommendations: It would appear that this patient does have cholelithiasis proven by previous x-rays, but this situation could be modified by corrective surgery. Also her diabetes and ulcer situation should be able to be managed by good medical therapy. *Following these corrections we feel that this patient is not restricted but probably has some degree of restriction until that time.*" (Emphasis supplied.)

Dr. R. A. Obenour, on January 23, 1967, stated:

"Minimal arteriolar schlerosis was noted on funduscopic examination. She may have some bronchitis related to her smoking but the extent of this is not thought to be severe. *I believe that some improvement could be expected from weight reduction, continued diabetic control, cessation of smoking, and if necessary more specific treatment for her chronic bronchitis.* On the basis of the present findings she might be limited by her pulmonary impairment from performing heavy work *but would not be limited for performing moderate or light work on a sustained basis.* (Emphasis supplied.)

Walter C. Shea, who had been her treating physician for some years before

---

1. Her husband testified that the burden of her work was in part responsible for appellant's disabilities. He said that after she left her job, Union Carbide *had to hire about six people to replace her.*

2. The record does not warrant the statement that plaintiff was "awarded her *full* retirement benefits for *total* disability." (Emphasis supplied.)

the present proceedings, said on December 5, 1966:

"At times she is ambulatory with limitation of employment due to chronic and persistent illness.[3]

"She is unable to hold down any job which requires much physical labor for any prolonged period of time."

Finally, on May 7, 1967, Dr. Shea stated:

"Due to multiplicity of complaints I believe Mrs. Jenkins has shown over the past two years I believe her absenteeism rather marked and she is an unreliable employee.

"I believe she can be gainfully employed for short periods of time if she can find employment under these circumstances."

Mrs. Jenkins had a multiplicity of complaints, suffering from bronchitis, diabetes, chronic overweight, bursitis and ulcers. Her weight had varied. At the time of the hearing she was 5' 6" tall and weighed 185 pounds. She had once reached a weight of 190. She considered that her proper weight was 160 pounds, although about four years prior to the hearing she weighed 139 pounds. She testified at the hearing that she had then quit her diet, finding it too burdensome. Control of her diabetes and ulcers was impaired by her failure to follow the advice of doctors. She was then smoking about one package of cigarettes every two days, although she had been advised to quit or to cut down on her smoking to control her bronchial complaints.

Despite her ailments, all of the doctors, including her own treating physician, expressed the view that appellant could engage in moderate or light work, albeit, according to Dr. Shea, her reliability was questionable as a result of her absenteeism. The vocational counselor, a University of Tennessee professor, expressed the opinion that light work within appellant's limited competence was available within the area of her place of residence. He testified that such light work included employment as a salad maker, cashier, or nurse's aid. The trial examiner concluded as a matter of factual finding,

"The examining physicians, including claimant's own treating physician, are unanimous in their findings that even though the claimant does not have the residual capacity to engage in productive substantial gainful activity requiring physical exertion or labor for any prolonged period of time, neither of them rule out claimant's residual capacity to be gainfully employed in performing moderate or light work on a sustained basis."

and in another style said:

"Upon the basis of all the evidence of record in this case, and the conclusions and deductions made from such evidence, the hearing examiner finds that the claimant has failed to present sufficient evidence to establish that she has an impairment or impairments in combination severe enough to preclude her from engaging in any type of substantial gainful activity for a continuous period, without interruption, of not less than 12 months' duration and that, therefore, her application is without merit."

No question is raised as to the competence, integrity or credibility of the medical witnesses Collmann and Obenour who examined appellant for the Secretary. If there is some degree of conflict between Dr. Shea and these doctors, we are not persuaded that we should ignore their testimony or fault the examiner for relying upon their views. Lane v. Gardner, 374 F.2d 612, 616 (6th Cir. 1967).

▮ The burden of proving the disability which would entitle an applicant

---

3. Despite these chronic illnesses, Mrs. Jenkins had a good earnings record up to April 1, 1966. For the 25 quarters after 1959, her average quarterly earnings were $1,082.51.

to social security benefits is upon such applicant. Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967); Erickson v. Ribicoff, 305 F.2d 638 (6th Cir. 1962); 42 U.S.C. § 423(d) (5). The disability which must be shown is defined in Section 223(d) (1) of the Act as,

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1).

■ This Circuit had adhered to a Court made rule that if an applicant has established inability to engage in his or her regular employment, but has some residual capacity for light work, the burden is on the Secretary to show what light work the applicant can do and that such light work is being performed within reasonable proximity to the applicant's place of residence. Massey v. Celebrezze, 345 F.2d 146 (6th Cir. 1965); Hall v. Celebrezze, 314 F.2d 686 (6th Cir. 1963); May v. Gardner, 362 F.2d 616 (6th Cir. 1966). Whatever the present applicability of such rule, the Secretary's burden was met in this case.

■ We affirm the District Judge who granted the Secretary's motion for summary judgment upon his view that the findings of fact of the Secretary were supported by substantial evidence and were binding upon him. We are of a like view. 42 U.S.C. § 405(g); Nelson v. Gardner, 386 F.2d 92, 94 (6th Cir. 1967).

We are constrained, however, to say this much more, limited to plaintiff's "claim" of impaired eyesight. Appellant did not claim impaired eyesight in her application for benefits. Eye trouble appeared first as a result of some questions put to her by the trial examiner. We discuss it only because the dissent places great weight on it.

In her original application for benefits, she described her disabilities as "diabetes, ulcers, and bursitis," never once mentioning poor eyesight. The report of disability interview merely checks off a box denoting that appellant displayed some difficulty with her eyesight, but otherwise deals at length only with her other complaints. The record made contained reports of Mrs. Jenkins' hospitalization on several occasions. No mention of eye trouble is contained in any of these—the last relating to a period from April 22, 1966, the date she gives as the beginning of her total disability.

A total of ten doctors who had examined appellant on various occasions before and after the time of the claimed commencement of her disabilities, filed written reports. These included the several doctors who would see her at a hospital visit. In one report dated January 23, 1967, there is a notation "vision reduced in both eyes for about one year." In another of these reports, the examining doctor includes in his general report of physical examination, "Pupils are equal, react to light and accommodation * * *. Fundoscope examination is negative." Other than the foregoing, the doctors' reports make no reference to eye trouble. Her own Dr. Shea, upon whom she had long relied for treatment and upon whom she places chief reliance, makes no mention whatever of impaired eyesight as one of his patient's difficulties.

Mrs. Jenkins testified at the oral hearing on April 21, 1967. She was examined by her attorney and then by the trial examiner. On examination by her own attorney, she was asked to give the reasons for her inability to continue working. *She did not mention eye*

*trouble.*[4] Mention of it appeared only in the resumption of questioning by the trial examiner.

"Q. Why don't you drive?

A. I can't see. Lines runs together and I can't see which way I'm going. I can't judge my distance. My eyes just—letters seems like it just gets foggy. I just don't try it."

She then went on to say that her eye troubles persisted even when she wore her glasses; that she did not read much at home "without its big reading and big print." She then answered that a Dr. Millis had checked her eyes.

At the conclusion of the hearing the trial examiner suggested that appellant's counsel obtain a report from Dr. Millis. The hearing was then adjourned to May 9 to hear testimony of a vocational counselor. On that date appellant's attorney produced a letter from the optometrist, Dr. Fred B. Millis, O.D., dated at Lenoir City, Tennessee, Mrs. Jenkins' place of residence, advising of an examination of Mrs. Jenkins on May 4, 1967. The report was as follows:

"Re: Irene C. Jenkins.

On May 4, 1967 I examined the vision of Mrs. Irene Jenkins of Route 4, Lenoir City, Tenn. This is a record of my findings.

Vision without glasses:

Rt. Eye 20/200 Lt. eye 20/200 Both 20/200

Vision with glasses:

Rt. eye 20/20 Lt. eye 20/30 Both 20/20

Stereopsis is low; there is a definite vertical deviation in the alignment of her eyes resulting in double vision.

The eye pressure was within normal range. Due to the vertical deviation and the inability to see equally as clear out of both eyes, she suppresses vision in her right eye.

She has a record of variable blood pressure as well as a diabetic condition. Each of which makes it almost impossible to stabilize her visual problem.

I have been examining Mrs. Jenkins' vision since July, 1963; during this period of time I have observed a general deterioration in her vision.

Sincerely,
/s/ Dr. Fred Millis, O.D."

In this report Dr. Millis expresses no opinion as to what, if any, effect Mrs. Jenkins' eye condition would have upon her ability to work. He states that with glasses Mrs. Jenkins' combined vision of both eyes would be 20/20. To the layman, 20/20 vision is normal vision. The intendment of the optometrist's other recitals, if of relevancy here, is not expressed. While "double vision" sounds ominous, standing alone it gives no idea of the import or frequency of such disorder. What treatment might be employed to alleviate it is not set out. Certainly this report does not justify an assertion that the lady is "nearly blind".

This report was received in evidence with the examiner's comment that "it [the report] will be received in evidence * * * and the vocational witness, of course, will want to examine it as part of the medical evidence in this case." Although the examiner made no specific reference to the optometrist's report in reciting the difficulties and disabilities that were disclosed by the testimony and record, we assume that the vocational

---

4. After testifying at length about her difficulties without any mention of eye trouble, the following testimony was given, under questioning by her own counsel:
"Q. Did you have any other problems about doing your work other than your legs and your back?
"A. Well, no, not nothing but through my arms and my shoulders. Well, they got, you know, with that bursitis and stuff and I couldn't lift no pans or anything up over my head; and we had to lift them and put them up in a box; and I couldn't lift them up, had to have help on that."
We are not convinced that failure to rely on eye trouble was the fault of appellant's lawyer. The entire record is persuasive of appellant's belated reliance on it as a disability.

counselor had examined the optometrist's report prior to his conclusion that Mrs. Jenkins could be gainfully employed. On cross-examination by appellant's attorney, the vocational expert did answer that nurses aides and cashiers would require sufficient eyesight to do the customary duties of that work—reading a thermometer or the numbers on a cash register, taking blood pressure and checking pulse.[5]

At the conclusion of the May 9 hearing, the record was kept open to allow appellant's counsel to obtain further medical evidence from Dr. Shea. A final report from Dr. Shea, Mrs. Jenkins' own doctor, dated May 17, 1967, was received. Although the optometrist's report was then available, Dr. Shea's report makes no mention whatever of impaired vision. As set out above, he concludes his final letter:

"I believe she can be gainfully employed for short periods of time if she can find employment under these circumstances."

At the same time as the filing of Dr. Shea's report, Mrs. Jenkins' attorney filed her affidavit which for the first time included a claim that impaired eyesight was a contributing element to her disability. She said, among other things:

"I have cut myself on these machines on occasion, and to a certain extent they are dangerous for a person with my eyesight, and with my other ailments, which cause me to bleed more easily, to black out, etc."

The trial examiner's decision considers the late claim of reduced eyesight specifically, but concludes, as previously quoted, that:

"Upon the basis of all the evidence of record in this case, and the conclusions and deductions made from such evidence, the hearing examiner finds that the claimant has failed to present sufficient evidence to establish that she has an impairment or impairments in combination severe enough to preclude her from engaging in any type of substantial gainful activity for a continuous period, without interruption, of not less than 12 months duration and that, therefore, her application is without merit." [6]

◾ The trial examiner found that appellant did not meet her burden of proof. The Secretary joined in that conclusion. Neither the District Court nor this Court can strike down these conclusions unless it can be said that they were without support by substantial evidence. King v. Celebrezze, 341 F.2d 108, 109 (6th Cir. 1965); Hall v. Celebrezze, 340 F.2d 608 (6th Cir. 1965); 42 U.S.C. § 405(g). The mere belated mention of impairment of eyesight, without evidence to support a claim that it disabled appellant from gainful employment, will not do to meet her burden of proof, either before the Secretary or the courts on review.

Judgment affirmed.

McALLISTER, Senior Circuit Judge (dissenting).

I respectfully dissent.

As a preface to this dissent, it may be said that it used to be easy enough for an appellate court to affirm an administrative agency on the ground that the findings were supported "by substantial evidence," if it could find just a trace of evidence to support them. But that is not the case anymore. Congress grew critical of such affirmances which ignored conflicting evidence and, in turn, brought about harsh criticism of the courts for such decisions on the ground that cases were affirmed merely because the appellate court could find evidence in the record which, *viewed in isolation,* substantiated a Board's findings.

In Universal Camera Corp. v. National Labor Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, Mr. Justice Frankfurter de-

---

5. The vocational counselor did not say that plaintiff needed "unusually good vision" for this work.

6. The hearing examiner did not say that "claimant's deteriorated visual impairment results from her negligent failure to remedy her diabetes."

clared: "Protests against 'shocking injustices' and intimations of judicial 'abdication' with which some courts granted enforcement of the Board's orders stimulated pressures for legislative relief from alleged administrative excesses," with the result that the Taft-Hartley Act provided that such findings of fact must be "supported by substantial evidence *on the record as a whole. * * ** We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed upon them responsbility for assuring that the Board keeps within reasonable grounds. * * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

Since, as hereafter appears, there have been a great number of reversals compared to the affirmances of the decisions of the Hearing Examiner and the Secretary, this court has held in Sayers v. Gardner, 380 F.2d 940, 943 (C.A. 6), that

> *"the records should be carefully examined and reviewed by the courts, and an opinion should generally be written, setting forth the facts and the law, to show that the courts have, in reality, assumed more responsibility for the reasonableness and fairness of the decisions of federal agencies, than some courts have shown in the past;* and that reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function, as we have been directed and cautioned by the Supreme Court in Universal Camera Corp. v. N. L. R. B. *supra,* for this case obviously means

that courts should scrutinize the decisions of agencies, more than they have in the past, to ascertain whether they are reasonable and fair. The great number of errors and reversals, in the past, in these cases, constitute a warning signal." (Emphasis supplied.)

The appellate courts obviously took notice of the commands of the Supreme Court as to "searching the record" in review of agency findings, since little has been said by the Supreme Court on that subject since.

However, in disability benefit cases under the Social Security Act, the decisions of Hearing Examiners and their findings of fact and conclusions of law, upon which the Secretary's decisions were based, became so unjustifiable and hostile to the rights of poor people who became disabled, that the reviewing federal courts were shocked, and repeatedly reversed those decisions; and later adjudications, reversing like decisions, pointed out the unusual number of such cases that the courts were obliged to reverse, compared to the number that were affirmed, and emphasized what the Supreme Court had said as to *searching* examinations of the record.

As an instance, Judge Feinberg in Scott v. Celebrezze, 241 F.Supp. 733, 736 (S.D.N.Y.), emphasized how searching must be the review by the courts of the action of the Secretary, observing that in the cases reported in volumes 227–236 of Federal Supplement, the Secretary had been reversed or remanded 47 times, while upheld only 27 times. Likewise, in Seldomridge v. Celebrezze, 238 F.Supp. 610, 620 (E.D.Pa.), Judge Higginbotham emphasized that for September, October, and November of the 1964 Federal Supplement, the Social Security Administration was reversed in at least 75% of the cases and that 90% of the reversals were because of lack of substantial evidence to support the findings of the Secretary.

In Miracle v. Celebrezze, 351 F.2d 361, 382 (C.A. 6), this court commented on the statement made in Lightcap v. Celebrezze, D.C., 214 F.Supp. 209, 216, that the court, as adjured by the Supreme Court "must

now assume more responsibility for the reasonableness and fairness" of the federal agencies "than some courts have shown in the past," and "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." And the court emphasized:

"The review of cases for disability benefits under the Social Security Act is onerous from many aspects. The case before the Hearing Examiner is heard informally. This means that there is practically no examination or cross-examination of any witnesses, except the claimant himself, usually a man whose life has been one of hard labor, and with little education; and, sometimes, a Vocational Counselor. The record, for the most part, consists of letters and written statements regarding the disability claimed, the extent of it, or the lack of it. Many of these statements consist of official printed forms of applications and reports filled in, in the handwriting of various individuals; and their reproduction in the record often requires laborious decipherment. These records call for searching investigation by the district courts, and further searching investigation by appellate courts."

In the light of the prevailing opinion, therefore, it appeared that a dissent thereto should clearly show that a searching examination of the record has been made, and the undisputed facts fully stated; and it is this consideration which accounts for the length and detail of this opinion.

Appellant, Irene C. Jenkins, claimant herein, filed an application for disability benefits under the Social Security Act and, after denial by the Division of Disability Operations, filed an appeal from such denial, and asked for a hearing.

On the hearing, the Hearing Examiner denied her claim on the ground that her impairments did not constitute disability under the provisions of the Social Security Act. Appellant sought review by the District Court which, in effect, affirmed the decision of the Hearing Examiner.

We are of the opinion that the District Court and the Hearing Examiner were in error in holding that appellant was not disabled for the performance of substantial gainful activity by reason of a medically determinable physical impairment.

The purported evidence, on which the findings of the Hearing Examiner are based, crumbles upon careful analysis.

The errors in the findings of the Hearing Examiner are as follows:

1. The Hearing Examiner was guilty of prejudicial reversible error in holding that "clinical evidence" meant "objective clinical evidence" —and, although it appears that there was an enormous amount of "clinical data" or "clinical evidence" supporting the petitioner's claim, the Hearing Examiner held that there was "very little data" if any, to support the evidence of claimant's attending physician, Dr. Shea.

2. The Hearing Examiner was guilty of prejudicial error in making no findings as to the chief cause of claimant's disability—musculoskeletal impairments, which were sustained by a wealth of medical evidence and undisputed by anyone. The doctors employed by the Social Security Administration, upon whom the Hearing Examiner relied, never mentioned claimant's musculoskeletal disorders, which were the chief bases of her claim for disability. The Hearing Examiner did not even address a question to his so-called expert, the Vocational Counselor, with regard to these musculoskeletal impairments.

3. The Hearing Examiner's finding that claimant's diabetes was mild and could be controlled was not sustained by substantial evidence, while the evidence of her attending

physician was clear and definite that, even with the administration of insulin, her diabetes was uncontrollable.

4. The Hearing Examiner was guilty of prejudicial error in giving more credence to the report of a physician employed by the Social Security Administration, who had seen claimant on only one occasion, and dismissed the evidence of the physician who had attended her for six years and also reported on her impairments, treatments, and hospitalizations, together with numerous other physicians who had examined claimant over a period of years.

5. The Hearing Examiner was guilty of prejudicial error in his findings that claimant's impairment of eyesight and vision was due to her negligence in not following her treating physician's directions for diet to control her diabetes, when there was no evidence that claimant's impairment of vision resulted from her failure to follow her physician's instruction as to diet to control her diabetes.

6. The Hearing Examiner was guilty of reversible error in holding that claimant's attending physician, and the reports of other medical witnesses, were unanimous in their findings that, even though the claimant does not have the residual capacity to engage in productive substantial gainful employment, requiring physical exertion or labor for any prolonged period of time, neither of them rules out claimant's residual capacity to be gainfully employed in performing moderate or light work on a sustained basis. In fact, they indicate she has the capacity to engage in moderate work on a sustained basis. Claimant's attending physician did not make any finding that claimant could do moderate work on a sustained basis. He stated that he believed only that "she can be gain-fully employed for short periods of time * * *." Ability to do moderate work for short periods of time is not the capacity to engage in "substantial gainful activity."

7. The Hearing Examiner was guilty of prejudicial error in his findings in paying no attention to the evidence of claimant's pain, which was the causative factor in her stopping her work, and in failing to inquire of his Vocational Counselor what result such pain might have if she tried to resume her work—and in failing even to mention "pain" in his hypothetical questions to the Vocational Counselor, and in failing even to mention the word "pain" in his findings.

As a preliminary matter to the understanding of the issues, certain statements in the prevailing opinion warrant discussion.

First, the prevailing opinion states that there are three errors in the statement of fact in this opinion:

1. "the Hearing Examiner did not say that 'claimant's deteriorated visual impairment results from her negligent failure to remedy her diabetes.'"

As a statement preliminary to the discussion of the case, it is to be said that the Hearing Examiner not only said that—he said it much more specifically and emphatically when he stated:

"Since the filing of her application, claimant also complains of *poor vision.* * * * She has, however, visited an Optometrist, who examined the claimant as late as May 4, 1967, and found that her poor vision is correctable with glasses to 20/20 in the right and 20/30 in the left. He further notes that claimant has a record of variable blood pressure as well as a diabetic condition which makes it almost impossible to stabilize *her visual problem* and that he has observed a *general deterioration*

*in her vision,* since July 1963. Again, it is noted here that with claimant's full cooperation with her treating physician in following his instructions for controlling her diabetes and obesity, this impairment, too, can be greatly improved and stabilized." (Emphasis supplied.)

It is to be remarked that the optometrist did not find that "her poor vision" is "correctable with glasses." He did not mention the phrase, "correctable with glasses." He did state that during the prior four years, there was "a general deterioration of her vision." There is a difference between vision with glasses and "poor vision," as a result of disease. The so-called "poor vision" was not correctable with glasses because claimant had what he stated was "double vision"; and her stereopsis, or depth perception, was low, and she had been suffering a general deterioration in her vision for several years. However, to revert to the statement that "the Hearing Examiner did not say that claimant's deteriorated visual impairment results from her negligent failure to remedy her diabetes," the foregoing quotation from the Hearing Examiner's findings is certainly a statement that if she cooperated with her treating physician in controlling her diabetes—which the Hearing Examiner found she did not do—this deterioration and impairment of her vision could be greatly improved and stabilized. Is this not the same as a statement that claimant's deteriorated visual impairment results from her negligent failure to remedy her diabetes? That is what the Hearing Examiner stated and meant. The statement in the prevailing opinion to the contrary was apparently made under a misapprehension of what the record showed.

There is no evidence of any kind to support the finding that claimant's visual impairment could be improved by following instructions for controlling her diabetes. No one ever contended that claimant's visual impairment could be remedied by following instructions for controlling her diabetes during the hearing; no one testified to it or mentioned it, and no medical report faintly suggested it.

In the prevailing opinion it is stated:

"The record does not warrant the statement that plaintiff was 'awarded her full retirement benefits for total disability.'"

What the record shows, however, is that, after her employer paid her full salary for four months, during which she was physically incapacitated but kept on the rolls as an employee, the employer, when claimant's personal physician ordered her not to work anymore, arranged with his insurer, and paid her a disability pension of a lump sum of $900.00, and a monthly pension of $56.37. These payments were made for claimant's total disability. They were considered retirement benefits for total disability. Were they the *full* retirement benefits for total disability? That does not specifically appear in the record. Whether they were the *full* retirement benefits for total disability— and the prevailing opinion questions the use of the word "full"—or substantial benefits for total disability, is not a crucial issue here, and makes no difference as far as this case is concerned; and, if it causes any dispute, the word "full" can be omitted—and it is hereby omitted— without affecting the results for which this opinion stands; although I believe, as far as the employer and the insurer go, the payments were for *full* retirement benefits for total disability. Without the addition of the word "full," the record substantiates that the payments made by the employer and insurer to the claimant were retirement benefits for disability from doing any work whatever for her employer (which was ordered by claimant's personal physician)—or, for total disability. This important point is undisputed that the retirement benefits paid to claimant by the employer and his insurer were for total disability.

The third and final statement in the prevailing opinion with regard to the statement of facts in this opinion is that the report of Dr. Fred Millis

3. "does not justify an assertion that the lady is 'nearly blind.' "

In this opinion, it is not stated that the report of Dr. Fred Millis justified an assertion "that the lady is 'nearly blind.' " Dr. Millis had made a report with regard to claimant, stating that "stereopsis is low." When stereopsis is low, it means that the person's visual depth perception is low. Dr. Millis also said that she had a vertical deviation in the alignment of her eyes resulting in double vision. (I shall demonstrate later that double vision is perfectly understandable by reference to Webster's International Dictionary; and the court takes judicial notice of dictionary definitions.) Dr. Millis also said that "due to the vertical deviation and inability to see equally as clear out of both eyes, she suppresses vision in the right eye." He also stated: "It is almost impossible to stabilize her vision properly." He further stated that for four years before his examination on March 4, 1967, he had "observed a general deterioration in her vision." In addition to the foregoing, claimant, who had always driven a car, testified that for the previous year she had been unable to drive a car because the lines kept running together. She further stated, as observed in the prevailing opinion, "that her eye troubles persisted even when she wore glasses; that she did not read much without it's big reading and big print." Also quoted in the prevailing opinion is her examination before the trial examiner:

"Q.  Why don't you drive?

A.  I can't see. Lines run together and I can't see which way I'm going. I can't judge my distance. My eyes just—letters seems like it just gets foggy."

It was not stated in this opinion that Dr. Millis reported that "the lady is 'nearly blind.' "  But, as this opinion demonstrates and as shall be shown later, the statement that "she is nearly blind" seems completely justified by the uncontradicted evidence.

As far as the statement in the prevailing opinion goes that

4. "The Vocational Counselor did not say that plaintiff needed 'unusually good vision for this work.' "

(reading clinical thermometers as a nurses' aide and checking patients' pulse with the use of a second hand on a watch) —extensive discussion follows later.

Claimant is a woman fifty-eight years old. She is five feet, six inches tall and weighs 185 pounds. She never went beyond the sixth grade, and has never had any special training. She is married but has no children under the age of eighteen. Her only work experience has been as salad-maker in a cafeteria.

As early as November 5, 1960, seven years before the hearing in this case, claimant was admitted to the East Tennessee Baptist Hospital. She was then suffering from a number of afflictions. She was a patient in the hospital at that time for a period of ten days. Doctors Inge, Willien, and Crumley, in consultation, made a diagnosis of claimant, finding that she was suffering from subdeltoid bursitis, right, and psychoneurosis. At the same time, Dr. Dan Davis reported a diagnosis, which he made at the hospital, of:

"(1)  Acute periarthritis, right shoulder

(2)  Diabetes mellitus, mild, controlled (history)

(3)  Anxiety reaction with conversion manifestations."

With this condition existing in 1960, claimant's physical and mental state appears to have deteriorated greatly since that time.

We shall first discuss claimant's own testimony; that of her husband, and the evidence of the doctor who examined her to attempt to remedy her visual defects for several years, up to the date of the hearing. Thereafter, we shall examine and consider the general medical evidence in the case.

On the hearing held on April 21, 1967, claimant testified, first, with reference to her obesity, stating that diet did not affect it; that, when in the hospital, she was placed on a diet of 1500 calories, she gained, in a short time, four pounds; that she had not driven a car for a long time because her eyesight had become so poor, that the lines ran together and she could not see where she was going; that her optometrist, Dr. Fred B. Millis of Lenoir City, Tennessee, had tried to check her eyes in the Summer of 1966, but that, because of the diabetes—"the sugar has been running so high on me that he can't check 'em."

While the hearing was still open, and upon the request of the Hearing Examiner for a further report from Dr. Millis, her optometrist, the latter, on May 4, 1967, furnished the requested report, in which he gave his findings of her vision and stated that she had a vertical deviation in the alignment of her eyes resulting in double vision; that due to the vertical deviation and inability to see equally as clear out of both eyes, she suppressed vision in her right eye, and that during the prior four years there had been a general deterioration in her vision.

This was the only expert evidence in the case with regard to claimant's vertical deviation in the alignment of her eyes, resulting in double vision, inability to see equally as clear out of both eyes, inability to stabilize her vision because of variable blood pressure and a diabetic condition, and general deterioration of her vision over the preceding four years, up to and including the time of the hearing; and it supports the undisputed testimony of claimant that she could not drive a car because of her poor eyesight which caused the lines of the road to run together, resulting in her not being able to see where she was going; that her glasses did not help her in reading— "I can't do no good with my glasses, either"; and that she was not able to read "without it's awful big reading and big print * * *."

Claimant testified she worked as a salad-maker in the cafeteria at Oak Ridge, for the Union Carbide Company for twenty years and seven months. She stated that the last work she performed was on June 18, 1966; that she felt sick all that week, and on the following Monday morning, she got up to go back to work, and "I just couldn't stand up. My back and legs just wouldn't work with me. I was just sick. * * * I went to the doctor that day." Up to the last day of her work, she testified, "I hadn't been too regular [in her work]. I'd been, you know, I was sick so much. Well, right at the first of '66, why I held out pretty good; then about six months of it then, I had it from there on out, you know, just up and down in the hospital, back home. He [the doctor] would keep me off four or five weeks then I'd go back and work a while, and then I went back, I was sick again. He put me in the hospital, and I went back home." For the first fifteen years that she worked for Union Carbide, "I made it pretty good. * * * The last five years went to going down on me." She testified it got "really bad, * * * in '66, and '65. The last of it. * * * I would work some maybe and I was off some. * * * Got to where I stayed off so much, well in '66 I was off a lot and so they—I just couldn't make it. * * * They just stopped; see, they terminated me and I didn't get to go over there. I didn't get to go back and make it. * * * They terminated me while I was off sick." The ground of termination was loss of time. The company told her that if she didn't take her retirement, they would "automatic fire me, terminate me," so she told them that if that's the way they felt about it, she didn't have any other choice, so she retired. She testified:

"Q. What was the reason that you couldn't do the work?

A. Well, I just wasn't able to do it. I wasn't able to stand on that concrete and do it. I just couldn't hold out there. They took me off of it and wouldn't let me go back on it.

Q. Who did?

A. Dr. Shea.

Q. Dr. Shea? Is he your family doctor?

A. Yeah.

Q. Well, what would happen while you were working? You say you couldn't stand up under it? Explain just what—

A. Well, my back—my back and legs would hurt me and they just would give down on me, and I fell two or three times over there, and I just couldn't stand to stand up under it, and I couldn't do the work. It was too much heavy lifting, and I just couldn't do it."

Claimant testified that her job as a salad-maker—making different kinds of salad—required her to stand on her feet eight hours, "the whole time, we got thirty minutes for lunch." She also stood in the line and served the salad. "Some of us stood in line and served it and kept the line going; and others would go back in the back and keep things—" .

"Q. Did you have any other problems about doing your work other than your legs and your back?

A. Well, no, nothing but through my arms and my shoulders. Well, they got, you know, with that bursitis and stuff and I couldn't lift no pans or nothing up over my head; and we had to lift them and put them up in a box; and I couldn't lift them up, had to have help on that."

Part of the claimant's job was lifting the pans, putting them in the refrigerator; and she could not lift her arms over her head. She didn't have the strength to hold things without bracing her arms against her side; if she didn't, she would drop them. At the time of the hearing, she had had that condition nearly a year. She had not had an operation, because she said they couldn't operate on her because of her diabetes, because of "this sugar. * * * It won't heal up." She also had ulcers, according to her family physician, Dr. Shea. She had been in the hospital six times during the two years prior to the hearing, once for seventeen days, the other times, for eight or nine days, except the last time for five days. She was in the hospital for the arthritis, and then for her diabetes;. and, afterward, for ulcers and a few months before the hearing, for pneumonia. Her diabetes, she said, made her dizzy. She took 65 units of insulin every morning. Before insulin, which she had been taking for about six months, the disease had been fairly well controlled by pills— Orinase. She also was troubled with "smothering," a difficulty in catching her breath, nervousness. There was no question that she had gall-bladder disease, and had gallstones for several years before the hearing. At the time of the hearing claimant testified she did the cooking for her husband and herself. She could not clean the house, or do sweeping; she had been hiring a woman to do that. Since the cleaning woman had been sick, claimant said she had been "pretending" to sweep and clean, but she couldn't do it. She could not mop or wax. "It just kills me * * *. It just pulls my back in two." Claimant's husband testified that, in addition to his work as a truck driver for Union Carbide, he did the mopping and waxing when he got home at night; that he was worried about her trying to do any such housework because of her diabetes; that a few months before the hearing, he had found claimant on her bed, "blacked out"; "she couldn't breathe, and I rushed her to the hospital." He also testified that she had fallen at work on several occasions.

First of all, it is to be emphasized that the Union Carbide Company, claimant's employer at the cafeteria where she worked at Oak Ridge, Tennessee, awarded her retirement benefits for total disability, after her employment with the company for a period of twenty years and seven months. The disability payments from the company commenced in October 1966. At that time claimant was awarded a lump sum payment of $900.00

and payments on disability pension of $56.37 a month. In spite of a high absentee record, because of her numerous hospitalizations, and because of her doctor's orders to remain at home during many of her painful and chronic illnesses —her last period of absence from work being for four full months, from June 1, 1966, to October 1, 1966—the company continued to pay her full pay during that time.

The reason claimant gave for the award of retirement benefits from the company for her disability was: "I wasn't able to work and I wasn't able to keep up my job and hold up my job * * * I just wasn't able to do [the work]. I wasn't able to stand on that concrete and do it. [Dr. Shea] took me off of it and wouldn't let me go back on it. [He] is [my] family doctor. * * * my back and legs would hurt me and they would just give down on me, and I fell two or three times over there, and I just couldn't stand to stand up under it, and I couldn't do the work. It was too much heavy lifting, and I just couldn't do it * * * my feet flew out from under me or something happened, and I fell and went back under the back. * * * I fell in the canteen hall there [another time] I fell on my back there * * * I got to where, you know, I couldn't make it back over there."

We proceed, then, to discuss the medical evidence in the case. As has been remarked, in 1960, seven years before the hearing, claimant was admitted to the East Tennessee Baptist Hospital in Knoxville, where she was a patient for ten days, and where three physicians, in consultation, made a diagnosis that claimant was suffering from subdeltoid bursitis, right, and psychoneurosis, and Dr. Dan Davis reported a diagnosis of acute periarthritis, right shoulder, diabetes mellitus, mild, controlled (history), and anxiety reaction with conversion manifestations.

On April 22, 1966, claimant was admitted to the Charles H. Bacon Hospital, in London, Tennessee, with an admitting diagnosis of purulent bronchitis, cervical myositis, and hemorrhoids, and a past history of diabetes mellitus, duodenal ulcer, recurrent cystitis, and rheumatoid arthritis. She had a cough and a low grade fever. Her response to antibiotics was poor, and her diabetes poorly controlled. Her doctor, as was stated in the hospital case history, was Walter C. Shea, Jr. Dr. Shea, in the hospital report at that time, stated that he had been treating claimant for two years for bronchitis, gastroenteritis,[1] pyelitis, and that her last illness "has been for Purulant Bronchitis."

On an official "Report of Disability Interview" by William P. Merritt, on behalf of the Social Security Administration, on June 27, 1966, Mr. Merritt, after reciting what claimant stated about her complaints, went on to report: "She seemed to walk with difficulty. She had rather extreme difficulty in talking to the point, that at times she was incoherent. When she first sat down she seemed out of breath. Her left arm seemed to be stiff, and she appeared to have limited use of it. * * * She had trouble remembering, writing, responding and understanding questions. She also seemed very nervous. She certainly appeared to be in some noticeable physical distress."

On July 20, 1966, at the request of the Social Security Administration in Knoxville, Tennessee, Dr. Gino Zanolli examined claimant and rendered a general medical report. Dr. Zanolli is a specialist in occupational medicine and preventive medicine, and is Assistant Director of the Oak Ridge National Laboratories at Oak Ridge, Tennessee, which is in charge of periodic physical examinations of employees of the Union Carbide Company, for which claimant worked. Dr. Zanolli reported that claimant was found to be a diabetic in 1959, and that the

---

1. Inflammation of the lining membrane of the stomach and intestines, accompanied by pain in the stomach and in the intestines.

disease had been controlled with diet and oral medication, but that as a result of a number of annual examinations, most observers felt that the control of her diabetes was only fair, at best; that she had upper gastrointestinal complaints which have been diagnosed as peptic ulcer, "and has had flare ups periodically on this basis. Was diagnosed many years ago as having possible gall bladder disease. * * * " Dr. Zanolli also reported to the Social Security Administration that claimant "has had musculoskeletal complaints of a chronic nature and intermittent back complaints. Several multiple episodes of bursitis, particularly affecting left shoulder and lower extremity joints. She has also had intermittent GU (genito urinary) complaints, presumably on a recurrent cystitis basis. * * * She has had some evidence of peripheral arteriosclerosis, likely associated with her diabetes. She has been overweight most of her work period, ranging from a few pounds to as much as 40 lbs, and has a high absentee record." Dr. Zanolli's diagnosis was: Diabetes mellitus, controlled with diet and medication since 1959 but, as he had previously noted, most of the medical observers in "periodic examinations on an annual basis" for the seven years prior to his examination, felt that such control was "fair at best." Dr. Zanolli diagnosed claimant as also suffering from chronic upper gastrointestinal complaints compatible with peptic ulcer syndrome; multiple joint complaints, low grade, possibly indicative of low grade rheumatoid arthritis; obesity, varying from mild to considerable; borderline high blood pressure; possible chronic gall bladder disease, and sporadic episodes of cystitis.

Under the heading of "Physical Findings" appearing on the official approved form of the Department of Health, Education and Welfare, provided by the Social Security Administration for Dr. Zanolli's report, Dr. Zanolli listed the findings of the "Last complete periodic examination * * * done on 4–13–65, performed by Dr. A. Seaton Garrett, Jr.,

ORNL (Oak Ridge National Laboratory) Health Division Staff Physician. *Specific findings* on that occasion were:

"(1)  Diabetes mellitus

(2)  Hypertension (BP [Blood Pressure] within normal limits today)

(3)  Duodenal ulcer (minor symptoms at present)

(4)  *Cholelithiasis with recent episode of cholecystitis*

(5)  Obesity

(6)  Post-menopausal vaginal bleeding, etiology undetermined." (Emphasis supplied)

Cholelithiasis is defined as: "The production of, or condition of being affected with, biliary calculi, or gallstones."

Cholecystitis is defined as: "Inflammation of the gall bladder." Webster's New International Dictionary.

On December 5, 1966, Dr. Walter C. Shea, Jr. wrote a letter to claimant's attorney, which was a part of the evidence before the Hearing Examiner, in which Dr. Shea stated:

"The information we have sent to Social Security is completely inadequate for evaluation of her disability for Social Security.

"Her condition at this time is that she is a Diabetic on Insulin for some six (6) months, prior to this she was fairly well controlled on oral medication.

"She has had two episodes of Duodenal Ulcer with partial obstruction and has had recurrent urinary tract infection with one episode of Pyelitis. She has recurrent Bursitis and Tendonitis of the shoulders. At this time she has a restriction of motion of left shoulder due to Fibrosis secondary to acute Bursitis left shoulder. She has a chronic pulmonary disease, Chronic Bronchitis with numerous episodes of upper respiratory infection. She has Osteoarthritic changes of the spine. She has a labile hypertension. She has Diabetes which becomes out of control.

"At times she is ambulatory with limitation of employment due to chronic and persistent illness.

"She is unable to hold down any job which requires much physical labor for any prolonged period of time."

In response to the Hearing Examiner's request for a more recent statement, Dr. Shea, on May 17, 1967, reported the following which was filed and made a part of the evidence:

"Mrs. Jenkins was hospitalized in January 1965, for recurrent flare-ups of her ulcer. She was hospitalized for ten days. At this time, she had Myositis of the left shoulder, her Diabetes was out of control. She returned to work on February 15, 1965.

"She was out of work again on March 1, 1965, with chronic backache and peripheral edema.

"In October, 1965, she had a flare-up of her ulcer but was not hospitalized.

"In November, 1965, she had an acute flare-up of Arthritis with low back strain.

"In December, 1965, she had an acute Bronchitis.

"In February, 1966, she had an acute purlant Bronchitis.

"In April, 1966, she had an acute purlant Bronchitis which persisted during the month of April with her Diabetes out of control. She was hospitalized April 22, 1966, and was discharged May 4, 1966. At this time, she was placed on Insulin for her Diabetes.

"Through May, 1966, her blood sugar remained elevated even on Insulin.

"In June, 1966, she had an acute low back strain and developed an acute Myositis of the left shoulder. This developed into Fibrositis aggravated by Cervical Arthritis. She was out of work the month of June and was hospitalized June 23, 1966, and was discharged on July 2, 1966. She remains out of work all of this time due to shoulder trouble, through September, 1966.

"In October she had a laceration of the left hand.

"In November, 1966, she had an acute flare-up of her Cervical Arthritis.

"In February, 1967, she was hospitalized for an acute Bronchitis. She was hospitalized for six days.

"At this time [May 17, 1967] her Diabetes is still uncontrolled.

"Due to multiplicity of complaints I believe Mrs. Jenkins has shown over the past two years I believe her absenteeism is rather marked and she is an unreliable employee.

"I believe she can be gainfully employed for short periods of time if she can find employment under these circumstances."

In addition, then, to the reports and diagnoses of Doctors Davis, Inge, Willien, and Crumley, in 1960 (which were made while claimant was confined in the East Tennessee Baptist Hospital), we here repeat and group together in outline form, for greater clarity, the treatment and diagnoses of Dr. Shea, Dr. Zanolli and Dr. Garrett to emphasize the musculoskeletal afflictions of claimant.

Dr. Shea had treated and diagnosed claimant's illnesses and afflictions from July 11, 1961, to May 17, 1967, and, in addition to twenty-nine office calls in a little over three years, from July 11, 1961, to November 11, 1964, had treated her as his patient during hospitalization for (1) duodenal ulcer; (2) diabetes mellitus; (3) myositis of the left shoulder in January 1965, and chronic backache and peripheral edema (disabling claimant for work on March 1, 1965); (4) acute flareup of arthritis with low back strain in November 1965; (5) acute low back strain and acute myositis of the left shoulder, developing into fibrositis aggravated by cervical arthritis in June 1966 (claimant, as a result of shoulder and low back trouble, was hospitalized on June 23, 1966, discharged on July 2, 1966, and remained out of work all of this time from June through September 1966 because of pain resulting therefrom); (6) on July 20, 1966, Dr. Zanolli

diagnosed claimant as suffering from multiple joint complaints, low grade, possibly indicative of low grade rheumatoid arthritis. Dr. Zanolli, in an official Medical Report of the Department of Health, Education and Welfare, further stated: (7) "Mrs. Irene C. Jenkins has been an employee of Union Carbide for the past 21 years. *She has had a number of different medical entities in this time, and has had a number of periodic examinations on an annual basis in this time* [twenty-one years]. * * * She has had musculoskeletal complaints of a chronic nature and intermittent back complaints. (8) Several multiple episodes of bursitis, particularly affecting left shoulder and lower extremity joints." (Emphasis supplied.) (9) In November 1966, Dr. Shea diagnosed claimant as suffering from acute flare-up of cervical arthritis.

None of the foregoing acute, painful, chronic conditions are doubted or questioned by anyone. For more than six years, claimant, although suffering almost continual pain from bursitis, periarthritis, acute myositis of the left shoulder, chronic backache, acute low back strain, cervical arthritis and other musculoskeletal afflictions, kept on with her work, as well as trained new personnel, in spite of being hospitalized many times; and, in spite of a high absentee record—because of her afflictions and as a result of doctor's orders—increased her earnings to the point that, as the Hearing Examiner remarked, she had an "excellent earnings record. She hadn't missed a single quarter of earning social security credits up through March 31st, 1966, and her earnings in some of those years were * * * at least the maximum that is subject to social security taxes."

However, *the finding of fact of the Hearing Examiner*, sustained by the Appeals Council and the Secretary, *that the recurrent episodes of "musculoskeletal complaints were associated with claimant's failure to follow the regime for diet and medical control for her diabetes" is without any support in the evidence*, either in the medical reports filed in evidence, or in the testimony of any of the witnesses; and, in this regard, we refer to the medical witnesses employed by the Government.

Two physicians were retained by the Social Security Administration to examine the applicant: one, Dr. I. R. Collmann, referred to by the Hearing Examiner as a specialist in gastroenterology, and the other, Dr. R. A. Obenour, referred to as a specialist in pulmonary diseases. Dr. Collmann and Dr. Obenour saw claimant on only one occasion.

In Dr. Collmann's Medical Evaluation of Claimant he has this to say under the heading "Musculoskeletal: Numerous musculoskeletal complaints not well localized but generally affecting all joints, including the back. I cannot get these categorized with any swelling or any significant visible arthropathy." Under the heading of "Impression" in the Medical Evaluation, Dr. Collmann made no mention of musculoskeletal conditions. Under the heading "Recommendations," Dr. Collmann stated: "We will evaluate the studies that have been ordered up to the present time, and make final recommendations following that report." Under "Physical Examination," Dr. Collmann, with regard to claimant's musculoskeletal condition, stated: "Show minimal osteoarthropathy, nothing else." Dr. Collmann had no X-rays taken, except for the chest and for gastro-intestinal trouble; none for musculoskeletal conditions. In the "Recommendations" made following that report, Dr. Collmann in his final statement made no mention whatever of claimant's musculoskeletal condition.

Dr. Obenour, in his report, under the heading "Impression" did not mention anything whatever about claimant's musculoskeletal condition; and under the heading "Discussion" he stated that claimant presented multiple *complaints* referable to the musculoskeletal system; but in his final discussion and report to the Social Security Administration, Dr. Obenour said nothing whatever about her musculoskeletal condition.

All of the foregoing undisputed evidence clearly supports claimant's own testimony that when she was ordered by her family physician, Dr. Shea, to enter the hospital on June 23, 1966, and, on his orders, remained out of work from then on through September 1966, it was because of her musculoskeletal afflictions already described in detail by six different doctors and that, accepting such undisputed medical evidence, her testimony in conformity therewith is also to be accepted—she wasn't able to do the work; that she wasn't able to stand and do it; that her back and legs would hurt and "give down" on her; that, as a result she fell two or three times in the cafeteria toward the end of her service there; that she couldn't stand up under it and couldn't do the work; that the work of heavy lifting was too much for her; that her feet flew from under her causing her to fall on her back or fall to the floor at other times while she was at work; that she got to where she "couldn't make it back over there"; and that during this time she suffered almost continual pain resulting from these disabling afflictions.

There is no evidence that, in the most remote way, suggests that claimant's testimony in this regard is not true. In fact, all of the evidence points to the absolute truth of her statements of her cervical pain, shoulder pain, and low back pain as a result of disabling bursitis, arthritis, periarthritis, fibrositis, and other musculoskeletal disablement. To all of this evidence, the Hearing Examiner pays no attention. He makes no findings on the subject, except to indulge in the plainly erroneous statement that claimant's musculoskeletal complaints "were associated with her failure to follow the regime for diet and medical control of her diabetes," a finding that, as previously mentioned, is contrary to the undisputed evidence.

The foregoing, it is to be observed, *is solely concerned with claimant's musculoskeletal afflictions*.

This brings us to the discussion of *claimant's diabetes and its effect on her disability*.

As heretofore mentioned, claimant was suffering from diabetes in the latter part of 1959, which had been controlled up to July 20, 1966, according to Dr. Zanolli, the Assistant Medical Director of the Oak Ridge National Laboratory, who had examined her for her employer, the Union Carbide Company, on that date. It is to be emphasized that the diabetes had been controlled during this time in spite of the fact that, as Dr. Zanolli said, claimant had been overweight during most of the work period of more than twenty years, her overweight ranging from a few pounds to as much as forty pounds; and during the period of more than six years, from the time the disease of diabetes had been discovered, it is especially to be noted that *it had been controlled by diet and oral medication*.

Dr. Dan Davis reported in 1960 that claimant's diabetes was controlled at the time she had been a patient in the East Tennessee Baptist Hospital for ten days in November of that year.

Dr. Shea reported her diabetes was out of control in January 1965. In April 1966, Dr. Shea again reported her diabetes was out of control after hospitalization, and on May 4, 1966, she was placed on insulin instead of the oral medication of Orinase. Throughout May 1966, Dr. Shea reported "her blood sugar remained elevated even on Insulin."

In June 1966, she was hospitalized again—this time for acute low back strain, acute myositis of the left shoulder, developing into fibrositis aggravated by cervical arthritis, and, as a result of Dr. Shea's advice, claimant remained out of work for four months until October 1966; and in November 1966 had an acute flare-up of her cervical arthritis.

On December 5, 1966, Dr. Shea reported that claimant had been on insulin for six months; that, before that time, her diabetes was fairly well controlled on oral medication; but that, afterward, even on insulin, her diabetes "becomes

out of control." Claimant was hospitalized again in February 1967, during six days, for acute bronchitis. On April 21, 1967, claimant had testified before the Hearing Examiner. Afterward, on May 17, 1967, Dr. Shea reported her diabetes was still out of control even on insulin; and that was the last report filed in evidence. The two physicians employed by the Government, Dr. Collmann and Dr. Obenour, also made reports that were filed in evidence relating to claimant's diabetes, several months to a year before Dr. Shea's reports above mentioned.

Dr. Collmann examined claimant on September 29, 1966, and reported with reference to her diabetes: "She has a history of diabetes for several years but has been taking Insulin at the rate of 30 units per day since earlier this year, which seems to fairly well control it. She has been obese for a long time and has been gaining weight rather than losing weight *in spite of the fact she has chronic indigestion and pain throughout her abdomen particularly in the epigastrium, not related specifically to type of food,* but stating if she puts a little bit of food in her stomach she is comfortable and if she puts too much she is uncomfortable or if she is empty she is uncomfortable." (Emphasis supplied) This was the only mention of diabetes by Dr. Collmann in his medical evaluation of claimant. *His recommendations as to claimant's diabetes was:* "Also her diabetes and ulcer situation should be able to be managed by good medical therapy."

Dr. Collmann's medical evaluation, stating that claimant's diabetes seemed fairly well controlled under insulin, was made, it is to be noted, on August 29, 1966. This was three months after Dr. Shea had reported that claimant's blood sugar had remained elevated even on insulin, and was prior to Dr. Shea's report of December 5, 1966, that "her Diabetes becomes out of control"—and five months before Dr. Shea's final report that "her Diabetes is still uncontrolled."

Dr. Collmann's statement that, according to her history, claimant's diabetes *seemed* fairly well controlled since she had been taking insulin, was from her prior history which obviously was from Dr. Zanolli's report of July 20, 1966, in which he used the words "that control is fair at best" with oral medication and diet, and from some prior report of Dr. Shea, which told of the shift to the use of insulin, in which he used the same words as Dr. Collmann that the diabetes was "fairly well controlled" before insulin, which, however, Dr. Shea, in the final medical report filed in the hearing, stated became "out of control." We mention the source of Dr. Collmann's medical evaluation—"she has a history of diabetes"—*because of the fact that he took no tests of her blood sugar.* He also stated that she had been "obese for a long time and has been gaining weight rather than losing weight," although, he stated, this was not related to the type of food she ate. In fact, his further evaluation on this point was entirely contrary to the Hearing Examiner's finding that the increase in weight was due to caloric intake. Dr. Collmann did not mention her increase in weight as due to caloric intake. Dr. Collmann did not know, at the time of his report on August 29, 1966, that, as claimant testified on April 21, 1967, when Dr. Shea put her on a diet, *he told her the insulin shots would definitely make her gain weight:* that when he "stepped them up" "why, my weight shot up!" Everyone knows that increase of weight comes from other factors than caloric intake. Glandular trouble causes increase in weight, and *drugs and medicines, of which insulin is one, affect certain glands.* Moreover, after a challenging cross-examination by the Hearing Examiner, who was trying to prove that her weight increase was due to not following a diet of Dr. Shea, claimant, without qualification, stated that the last time she saw Dr. Shea she had "been eating tomato and lettuce and stuff like that and bacon and eggs. That's what he told me to fix and eat, and cottage cheese, and stuff like that, and lettuce." It is undisputed that claimant was following this specific diet

that Dr. Shea had finally and definitely told her "to fix and eat."

In summation of Dr. Collmann's medical evaluation and recommendations as to claimant's diabetes, he stated: "Also her diabetes and ulcer situation *should* be able to be managed by good medical therapy." (Emphasis supplied.) This is pretty indefinite. What kind of good medical therapy?

This statement by Dr. Collmann is identical to the statement made by a physician employed by the Social Security Administration and rejected as substantial evidence in the recent case of Burrell v. Finch, 308 F.Supp. 264, 266 (D.C.Kansas) where the court said:

> "This doctor managed to report that in his opinion 'this patient is not at the present time totally disabled for gainful employment.' However, this opinion was modified by the statement, perhaps inadvertently overlooked by the Secretary, that this could be done 'with appropriate medical therapy and possibly psychotherapy.' He does not mention what this appropriate therapy might be, and success from treatment not described is speculative to say the least."

The reason for rejecting Dr. Collmann's testimony as speculative is even greater than the reason for rejecting the testimony in the *Burrell case, supra*, as the physician in the latter case said that the situation "could be done with appropriate therapy," while Dr. Collmann reported only that it "should be able to be managed by good medical therapy." In either case, such medical evidence was too speculative to be considered as substantive evidence.

Dr. Shea had been treating her for years for diabetes, first, with oral medication, Orinase, which kept the diabetes under fairly good control and, afterward, when oral medication could not control it, with insulin, when the diabetes kept getting out of control, until his last report on May 17, 1967, nine months after Dr. Collmann's medical evaluation and report, when Dr. Shea finally reported:

"At this time her Diabetes is still uncontrolled."

There is nothing to indicate the treatment claimant was receiving during the years from Dr. Shea was not "good medical therapy." There was nothing that Dr. Collmann suggested that was stated to be better or different from the therapy that Dr. Shea was using. In his final recommendations, Dr. Collmann, after observing that claimant had gallstones, that this condition could be modified by a surgical operation, and that her ulcers and diabetes *should be able to be managed by good medical therapy*, stated that, following these corrections, he felt that claimant "is not restricted but probably has some degree of restriction until that time." It is to be noted that Dr. Collmann, in his recommendations, never mentioned the musculoskeletal afflictions which were the chief cause of claimant's pain, suffering and disability.

The reason that Dr. Collmann made no diagnoses of, or recommendations as to, claimant's musculoskeletal afflictions was that, because he was a specialist in gastroenterology, he was concerned with claimant's affliction of gallstones and recommended that this could be remedied by corrective surgery, and that after such surgery, claimant would not be "restricted." It is to be emphasized that Dr. Shea, claimant's physician, who had been treating her continuously for six years, did not even mention the disabling effect of the gallstones—although the X-rays disclosed them, and although Dr. Garrett had found that claimant was suffering from inflammation of the gall bladder as a result. Dr. Shea obviously considered claimant to be in such a disabled condition from other afflictions that he considered it unnecessary to add to them, the items of gallstones and inflammation of claimant's gall bladder, from which admittedly she was suffering.

The next witness retained by the Government was Dr. Obenour, as previously mentioned. As to her diabetes, Dr. Obenour reported: "She has changes in her neurological examination consistent

with peripheral neuropathy which may be related to her diabetes. * * * It is my understanding that she takes 65 units of insulin daily to control her diabetes. * * * She may have *some* bronchitis related to her smoking *but the extent of this is not thought to be severe.* * * * I believe that some improvement could be expected from weight reduction, continued diabetic control, cessation of smoking, and if necessary *more specific treatment* for her chronic bronchitis. On the basis of the present findings *she might* be limited by her pulmonary impairment from performing heavy work but would not be limited for performing moderate or light work on a sustained basis."

The reason Dr. Obenour said nothing about claimant's musculoskeletal afflictions was because he never made an examination of her condition in this regard and stated in his report only, as to disability "on the basis of the present findings, she *might* be limited by her pulmonary impairment."

Dr. Obenour's testimony that claimant "*may* have *some* bronchitis related to her smoking but the extent of this is not *thought* to be severe"; that "*some* improvement *could be expected* from weight reduction, continued diabetic control, cessation of her smoking, and if necessary *more specific treatment* for her chronic bronchitis," and that "she might be limited by her pulmonary impairment from performing heavy work, but would not be limited for performing moderate or light work on a sustained basis"—is as speculative as the testimony of Dr. Collmann: "May have some bronchitis"; "not thought to be severe"; "believe some improvement could be expected" with "more specific treatment" (not mentioning, however, what such specific treatment might be) and "*might be limited* by her pulmonary impairment" —all these statements are as speculative as those held to be too speculative to constitute substantial evidence in the *Burrell case, supra*; and as said by the court in that case, constituted "an opin-

ion hedged with 'ifs' and 'possibilities,' " and that "a denial of benefits should not be withheld from this claimant on this kind of evidence in the face of findings of *treating* physicians and the convincing facts and circumstances of the case." P. 266 (Emphasis supplied.)

Dr. Obenour, like Dr. Collmann, saw claimant on only one occasion, on January 23, 1967. He found that her blood sugar and urine sugar were normal "at this examination." He believed that some improvement could be expected from weight and *continued diabetic control*. The fact was that, as appeared from the evidence of Dr. Shea, who had been regularly attending her over a period of six years, claimant's diabetes was out of control in January 1965. It was out of control in April 1966. Claimant was placed on insulin in May 1966, but her blood sugar remained elevated even on insulin. In May 1967, her diabetes was still uncontrolled, although insulin was being continually used by her. The foregoing evidence of Dr. Shea was the final medical evidence received on the hearing by the Examiner.

Here, then, are the reports of the doctors employed by the Social Security Administration, each of whom saw the claimant on only one occasion, and who made no mention of her musculoskeletal afflictions, from which the uncontradicted evidence shows she was suffering and which were the principal cause of her disability.

## FINDINGS OF HEARING EXAMINER

The findings of the Hearing Examiner are numerous and are so interspersed throughout a long opinion that, in order to demonstrate that they are unsupported by substantial evidence, it is necessary to disengage them from the body of the opinion and to discuss them in detail.

At the commencement of his findings, the Hearing Examiner states what appears to be his view of a broad and guiding rule for appraising the high value to be given to the evidence of physicians

employed by the Social Security Administration "for verification of the disability" of a claimant for benefits under the Act, as contrasted with the doubtful value of the evidence of a physician to whom a patient goes for "treatment" of his disability or, in other words, the value of the evidence in this case of physicians employed by the Social Security Administration for verification of a claimant's disability—and who see the claimant on only one occasion—and the lesser or doubtful value of the evidence of a physician who has treated the claimant for a continuous period of six years.

The Hearing Examiner stated:

"The evaluation of medical evidence for disability purposes is not always simple. The difficulty becomes apparent when we consider the difference in attitude of a patient who goes to a doctor for treatment, and a patient who goes to a doctor for verification of his disability. In the first case, the doctor has no reason to doubt the patient's story of his various symptoms, and clinical verification might be expensive and of little practical use in treatment. In the second case, where the patient is or may be seeking disability benefits of one kind or another, subjective symptoms have very little significance unless supported by clinical evidence. Too often the busy doctor fails to differentiate between these cases, and bases his diagnosis of the impairment of the disability applicant on the same subjective evidence he would consider important for the ordinary patient."

In the foregoing statement, the Hearing Examiner misunderstands the meaning of the terms, "clinical verification" and "clinical findings." He states that in the case where a patient goes to a doctor *for treatment*, "clinical verification might be expensive and of little practical use in treatment," and that "subjective symptoms have very little significance unless supported by clinical evidence."

Clinical verification and clinical evidence are not limited to objective evidence. Clinical evidence means the recognition, assessment, and evaluation by a physician of a subjective complaint, such as pain, or of objective evidence, such as physical manifestations. In other words, clinical evidence is evidence applying to either objective or subjective symptoms. Homm v. Gardner, 267 F. Supp. 926 (D.C.Mo.). "Clinical verification" or "clinical evidence" can only mean the recognition, assessment, and evaluation by a physician of subjective or objective symptoms. "Clinical" is defined as: "Pertaining to or founded on actual observation and treatment of patients, as distinguished from theoretical or experimental." Dorland's Illustrated Medical Dictionary, 23rd Edition, Reprinted August 1960, W. B. Saunders Company, Philadelphia and London. It is obvious, then, that the statement of the Hearing Examiner that where a patient goes to a doctor for treatment, "clinical verification" might "be expensive and of little practical use in treatment," is meaningless since, as above stated, the word, "clinical," means pertaining to, or founded on treatment of a patient.

The further statement of the Hearing Examiner that "where the patient is or may be seeking disability benefits of one kind or another, subjective symptoms have very little significance unless supported by clinical evidence," appears unintelligible, unless the Hearing Examiner considers clinical evidence to be the same as objective clinical evidence. It is difficult to imagine a case in which subjective symptoms are in issue, where there is no recognition, assessment, and evaluation of the symptoms by a physician.

As an appraisal of the high value to be placed on the evidence, in this case, of the physicians employed by the Social Security Administration for "clinical verification" of disability, and the lesser importance to be placed upon the evidence of the personal physician of claimant, who is described under the classification of "the busy doctor" who "fails to differentiate between these cases"—that is, between the case of the "clinical veri-

fication" of the patient's disability, and the "treatment" of the patient, we are of the view that the Hearing Examiner, at the outset, fell into the prejudicial error of considering the evidence of the physicians of the Social Security Administration of a higher quality and value than the physician who had treated claimant over a period of many years and who understood her particular physical afflictions; and that the Hearing Examiner's mistake was due to his misunderstanding of the terms, "clinical verification" and "clinical evidence."

The only explanation of this error that makes sense is that the Hearing Examiner considered that clinical evidence meant objective clinical evidence, and that clinical findings meant objective clinical findings. This was the prejudicial error in which the Hearing Examiner indulged in the cited case of *Homm* v. Gardner, *supra*, and in a multitude of other cases, especially in this court, in which it has been decided that it was reversible error for a Hearing Examiner to hold that the requirement that a medical determination, supported by clinical findings, meant that it be "supported by objective clinical findings. * * * The Act means nothing of the kind. * * * It was error on the part of the Hearing Examiner to hold, in this case, that the physician's opinions or conclusions must be supported by adequate objective clinical findings." Ross v. Gardner, 365 F.2d 554 (C.A. 6); Polly v. Gardner, 364 F.2d 969 (C.A. 6); Sayers v. Gardner, 380 F.2d 940 (C.A. 6); Marion v. Gardner, 359 F.2d 175 (C.A. 8); Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.Pa.); Page v. Celebrezze, 311 F.2d 757 (C.A. 5); Ber v. Celebrezze, 332 F.2d 293 (C.A. 2).

Pain, suffered by a Social Security claimant and disclosed only by subjective symptoms, does not mean that it ranks as a lesser type of disability than a disability with objective symptoms. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C. Ark.). The Hearing Examiner obviously went upon the supposition that subjective evidence of pain ranks as a lesser type of disability than a disability with objective symptoms. The Hearing Examiner's statement that subjective symptoms have little significance unless supported by clinical evidence, would be irrelevant unless he meant that subjective symptoms have very little significance unless supported by objective clinical evidence; and such a holding would be reversible error. Yet, such obviously is the holding of the Hearing Examiner in this case.

For, from the Hearing Examiner's findings with regard to the evidence of claimant's personal physician, Dr. Shea, it clearly appears that the Hearing Examiner considered that clinical evidence means objective clinical evidence, since, in his Findings and Conclusions, he states "that the most favorable evidence in support of her application appears in the statements made by her treating physician, Dr. Walter C. Shea, Jr. (Exhibits 14 and 23) as summarized and quoted above at pages 5, 12 and 13. It is noted, however, that *very little clinical data*, if any, appears in his statements. He presents a long list of ailments and indicates claimant's frequency of visits for treatment since July 11, 61." (Emphasis supplied.) What the Hearing Examiner means by "very little clinical data" is very little objective clinical data. The clinical data appearing in Dr. Shea's statements and reports is enormous: A history of continual medical treatment of claimant over a period of six years, including treatment for duodenal ulcer, bronchitis, diabetes mellitus, recurrent cystitis, rheumatoid arthritis, purulent bronchitis, cervical myositis, gastroenteritis, pyelitis, urinary tract infection, bursitis, tendonitis, fibrosis secondary to acute bursitis of the left shoulder, chronic pulmonary disease, upper respiratory infection, osteoarthritic changes of the spine, labile hypertension, peripheral neuritis, chronic backache and peripheral edema—all of such diagnoses and treatment having occurred during a period of from several years before claimant filed her application for disability benefits up to and including a couple of months be-

fore the Hearing Examiner made his findings in this case. During this period of treatment, claimant was hospitalized for considerable periods under the supervision and treatment of Dr. Shea. He prescribed certain medicine for her ulcer, and Orinase and insulin for her diabetes over a long period of time, as well as medicine for her pain and diathermy treatments for various of her musculoskeletal afflictions. In less than three and one-half years from July 11, 1961, to November 21, 1964, claimant had visited her physician's office on twenty-eight occasions, during which time she was hospitalized for two weeks in 1962; for ten days in April 1966; for four days in June 1966, and for six days in February 1967. After her hospitalization in June 1966, she remained out of work because of her shoulder trouble for four months, during which she was paid her regular salary by her employer. Finally, Dr. Shea told her she was to stop working. "He didn't let me go back on it." All of the time Dr. Shea was her attending physician.

An order by a family physician to a person not to work is, to that person, controlling and should be given its deserved weight in determining disability. Smith v. Celebrezze, D.C., 239 F.Supp. 337.

In spite of Dr. Shea's diagnoses and treatments of claimant during this long period of time, the Hearing Examiner filed findings that there was very little clinical data, if any, in Dr. Shea's statements, his long list of claimant's ailments, and the frequency of claimant's visits to him for treatment. The findings of the Hearing Examiner that the foregoing statements of diagnoses disclosed very little clinical data, if any, is without any evidence to support it. Obviously, the Hearing Examiner considered that no data was clinical data unless it was objective clinical data. The fact that clinical data or clinical evidence means the recognition, assessment, and evaluation by a physician of subjective or objective symptoms was ignored by the Hearing Examiner, and the only explanation of that fact is that he mistakenly thought that clinical data or evidence meant objective clinical evidence.

In Branham v. Gardner, 383 F.2d 614 (C.A. 6), a Hearing Examiner had held that "the Act requires that the impairment be 'medically determinable'; that is, the existence of an impairment must be established by *objective* medical, clinical, or laboratory evidence." This court determined that the "foregoing holding constituted prejudicial and reversible error," under the authority of Polly v. Gardner, 364 F.2d 969 (C.A. 6) and Ross v. Gardner, 365 F.2d 554 (C.A. 6). (Emphasis supplied.)

In Branham v. Gardner, *supra*, the court stated that the rule governing the case was clearly set forth in Ferran v. Flemming, 293 F.2d 568, 571 (C.A. 5), in which it was stated:

"Our review is ordinarily, of course, limited to determining merely whether there is substantial evidence to support the administrative findings. But here, just as in the 'clearly erroneous' review of a judge's findings, *when the fact-finder has failed to employ the proper legal standard in making its determination the finding may not stand.* Mitchell v. Mitchell Truck Lines, 5 Cir., 1961, 286 F.2d 721; Henderson and Poole v. Flemming, 5 Cir., 1960, 283 F.2d 882; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186. *The facts must be evaluated by the administrator in the light of correct legal standards to entitle the administrative findings to the insulation of the substantial evidence test.*" (Emphasis supplied.)

This court concluded that where the Hearing Examiner had held that the existence of an impairment must be established by objective clinical evidence, he was in error in evaluating the facts by correct legal standards and that, accordingly, there was no substantial evidence to support his findings.

In Hall v. Celebrezze, 314 F.2d 686, 689, 690 (C.A. 6), an early leading

case on the subject of disability benefits under the Social Security Act, Judge Weick, speaking for this court, declared:

"The Secretary gave no weight to the uncontradicted opinion evidence of Doctors Scott and Blair heretofore set forth with respect to Hall's disability. Since the statute required that the disability result from a 'medically determinable physical or mental impairment' (42 U.S.C. § 416(i) (1) and § 423(c) (2)), the claimant had no way of establishing his case if his credible medical evidence is disregarded. While the Secretary may have expertise in respect of some matters, we do not believe he supplants the medical expert.

"In our opinion, it was competent for medical experts to testify as to the nature and extent of Hall's ailments, whether temporary or permanent, their treatment and prognosis. They could testify as to what effect these ailments had on his health and his ability to perform manual labor including the degree of his disability."

The last important decision on the subject of a Hearing Examiner in applying improper standards in the determination of disability under the Social Security Act is to be found in Nelms v. Gardner, 386 F.2d 971, 973 (C.A. 6), where Judge Peck, speaking for the court, said:

"The record may fairly be considered conclusive as to appellant's inability to engage in gainful activities consisting of heavy manual labor, where lifting and bending is required, and in work requiring a relatively high degree of dexterity. *Thus, the principal impairment* alleged which might preclude appellant's employment in those light, sedentary jobs which demand neither of the above qualifications *is his complaint of continuous, knife-like pains in his back*. In discounting the severity of the pain complained of, the Secretary did not apply the proper standards.

"First, the examiner stated that 'general conclusions or naked medical diagnoses are insufficient [to establish a medically determinable impairment].' This holding was erroneous (Ross v. Gardner, 365 F.2d 554 (6th Cir. 1966); Polly v. Gardner, 364 F.2d 969 (6 Cir., 1966)), as was the corollary ruling that 'the existence of a condition must be established by objective medical, clinical or laboratory evidence.' Ross v. Gardner, supra; Polly v. Gardner, supra; Branham v. Gardner, 383 F.2d 614 (6th Cir. 1967). It is clear from the Hearing Examiner's decision that these errors were prejudicial and the case therefore must be reversed."

The Hearing Examiner's findings and conclusion that there was very little, if any, clinical evidence in Dr. Shea's reports of claimant's condition, afflictions, pains, and treatment, are completely unfounded in the evidence, and constitute prejudicial and reversible error. It is obviously based upon the supposition that clinical evidence means objective clinical evidence.

The Hearing Examiner found "that the presence of an organic basis for the multiple complaints claimant has made, involving diabetes, gastrointestional disorder, and bursitis, etc., is not sufficient to establish disability within the Act," and that claimant "had difficulty with the diabetic problem ever since 1959, which was aggravated by her exogenous obesity resulting in recurrent episodes of acute exacerbations of gastrointestinal, musculoskeletal, and vascular disorders, manifested by symptoms of duodenal ulcer * * *; possible gallstones; acute attacks of arthritis and bronchitis of brief duration." We refer to this finding to illustrate the Hearing Examiner's own acknowledgement of the almost unbelievable number of afflictions from which claimant suffered.

However, the Hearing Examiner made a finding that the evidence in the case, according to the two physicians employed by the Social Security Administration, disclosed that claimant's gastrointestinal, musculoskeletal, and vascular disorders were not severe, and were secondary to claimant's diabetic and obese condition;

that her treating physician recommended a limited diet and control of diabetes by oral medication, commencing late in 1959 and extending to the Spring of 1966; that there was nothing else of record to show that claimant's obesity could not be controlled by a limited caloric intake; and that there was no indication that claimant had diligently followed her physician's advice with respect to diet, but had "confessed at the oral hearing that she did not stay on her diet regularly. There is also some indication that she does not take her insulin with sufficient regularity to keep her diabetes under control." However, upon a careful review of the record, we find there is no evidence to support any of the findings of the Hearing Examiner set forth in this paragraph on which the Government relies.

As to the finding that claimant's diabetic problem—ever since 1959—culminating in recurrent episodes of acute exacerbation of gastrointestinal, musculoskeletal, and vascular disorders manifested by acute attacks of arthritis and bronchitis, was "aggravated by her exogenous obesity," a meticulous review of the record in this case, which has been studied and restudied for evidence, discloses that there is no evidence whatever to support a conclusion that claimant's diabetes was aggravated by exogenous obesity. No medical witness ever made such a statement. The word "aggravated," or any term similar to it in meaning, was never used by any witness; and the word itself appears nowhere in the record except in the Hearing Examiner's finding.

From 1959 to 1967, claimant was treated or examined by eight qualified physicians. None of these mentioned, in any diagnosis or report, "exogenous obesity." Dr. Zanolli, in July 1966, reported that claimant had been found to be a diabetic in 1959, but that the disease had been controlled with diet and oral medication. In January 1967, Dr. Obenour, the *ninth* physician to examine claimant, saw her on the single occasion when he was employed by the Social Security Administration to examine her. He reported that his "impression" was that claimant's obesity was exogenous. He apparently arrived at this conclusion because claimant was considerably overweight. He did not know that claimant had been overweight sometimes as much as forty pounds during her entire working period. He did not know that Dr. Shea had told claimant that the insulin which she took would make her weight shoot up; and that it would definitely make her continue to gain weight as he increased the dosage. Dr. Obenour seems not to have inquired from claimant as to her diet, since she testified that her weight fluctuated, and that diet did not help her, and that when she was in the hospital on a diet of 1500 calories, she gained four pounds. Dr. Obenour made no examination of her to ascertain whether her obesity was exogenous but merely gave that as "his impression." "Exogenous" means that there is no physical malfunction of the body which causes obesity. Recognized causes of involuntary obesity include psychological factors. See opinion of Judge Edwards in Mefford v. Gardner, 383 F.2d 748, 765 (C.A. 6), dissenting from the majority opinion only as to cause of disability. Claimant had been diagnosed as suffering from psychoneurosis and anxiety reaction with conversion manifestations as early as 1961. See Branham v. Gardner, 383 F.2d 614 (C.A. 6), for discussion of psychoneurosis and anxiety reaction as factors in disability cases under the Social Security Act. Dr. Obenour found that claimant had changes in her neurological examination consistent with peripheral neuropathy (an affection of the nervous system) which may be related to her diabetes. This finding, then, supports claimant's testimony that her weight fluctuated and that diet did not help her, since Dr. Obenour's conclusion, which was supported by laboratory findings, that she had neurological changes consistent with peripheral neuropathy, disclosed psychological factors which are recognized causes of involuntary obesity.

There was no evidence showing that claimant's obesity, exogenous or otherwise, resulted in recurrent episodes and acute exacerbation of gastrointestinal, musculoskeletal, and vascular disorders. As heretofore stated, claimant had been obese during all of her working period of twenty-one years, and overweight during that time, ranging from a few pounds to forty pounds.

In Sayers v. Gardner, 380 F.2d 940, 953 (C.A. 6), the Hearing Examiner, on the evidence of one of the medical reports that the applicant was obese, stated that obesity, in almost all cases, was remediable, and that, if claimant lost some weight, it might well be that she would have less pain and discomfort. *This court, in passing upon the accuracy of the Hearing Examiner's statement in the cited cases, declared that he obviously forgot that appellant had always been obese*, and had weighed approximately 195 pounds, not only at the time she underwent the medical examinations as a basis of securing disability benefits and at the time of the hearing, but was also of the same weight during all of her working years; *and that this fact showed lack of justification for the Hearing Examiner's view that appellant would suffer less pain if she lost some weight.*

Obesity, which seems to be a fairly common condition in workers who have been disabled, is a consideration, not for rejecting their claims for disability benefits, but in explanation why, in many cases, employment in a different field is not available to them. Mefford v. Gardner, *supra.*

It is unreasonable to suppose that an abnormally obese, illiterate fifty-six-year-old, who is able to work with her arms and shoulders only with pain, and who is able to locomote at all only with labor, would be able to obtain and pursue substantial gainful activity. Brown v. Gardner, D.C., 251 F.Supp. 770, 772.

If the claimant in the case before us was overweight ranging from a few pounds to forty pounds during her entire work experience of twenty-one years, her being overweight to the same degree at the present time is no evidence that her present disabled condition is the result of her being overweight.

Dr. Obenour's report, which is so strongly relied upon by the Hearing Examiner in his finding that claimant's diabetes is remediable, is speculative on its face. Dr. Obenour stated: *"I believe some improvement could be expected from weight reduction"* and "continued diabetic control." Dr. Obenour's statement of belief that *some improvement could be expected* points to speculation on his part. In Whalaen v. Ribicoff, 197 F.Supp. 1, 3 (D.C.Mass.), the court held that the phrases "it would appear that," and "would not seem" and "some substantial gainful activity" pointed to speculation on the part of the Referee and are too vague and indefinite to furnish a basis for the ultimate finding. For the same reason in the instant case, the mere statement of *belief* that *some improvement could be expected* is too indefinite to furnish a basis for the ultimate finding of the Hearing Examiner that sufficient improvement would result from weight reduction to remedy claimant's diabetes and to enable her to perform moderate or light work on a sustained basis.

Likewise, Dr. Collmann's statement that claimant's diabetes *"should be able to be managed by good medical therapy,"* and that "following these corrections, we *feel* that this patient is not restricted but *probably* has *some degree of restriction* until that time" is likewise speculative and too indefinite to furnish a basis for the ultimate finding of the Hearing Examiner that claimant's diabetes is remediable.

Without casting an implication of discredit upon Dr. Collmann and Dr. Obenour, it must be said that, in the light of the other medical reports in the case embodied particularly in the evidence of Dr. Zanolli, who was in charge of the medical clinic that made annual physical examinations of claimant over a period of more than twenty years, and the evidence of Dr. Shea, who continuously

diagnosed and treated claimant over a period of more than six years, the medical reports of Dr. Collmann and of Dr. Obenour are pretty skimpy, because they did not know that claimant had been obese and, at times, forty pounds overweight during various periods of her twenty-one years' service with her employer, and did not know of her musculoskeletal afflictions which were diagnosed as early as 1960 and treated continuously by Dr. Shea from 1961 to the middle of 1967. This is a valid explanation for their rather speculative statements since they saw claimant on only one occasion, when they were employed to examine her on behalf of the Social Security Administration which was opposing her claim for disability benefits. It is to be noted also that the fact that physicians were employed by the Social Security Administration, goes to the weight to be given their evidence. Colwell v. Gardner, 386 F.2d 56 (C.A. 6).

It will be recalled that Dr. Collmann, who saw claimant once when, on behalf of the Social Security Administration, he examined her, stated in his "Recommendations" : "It does appear that this patient does have cholelithiasis proven by previous X-rays, but this situation could be modified by corrective surgery. Also her diabetes and ulcer situation should be able to be managed by good medical therapy. Following these corrections, we feel that this patient is not restricted but probably has some degree of restriction until that time." Dr. Collmann was completely mistaken about the amount of insulin which claimant was taking, stating that she was taking 30 units per day when her uncontradicted testimony was that she was taking 65 units per day. If he had not mistaken the amount of insulin which claimant was taking, he might have considered that her dosage of 65 units per day was "good medical therapy." Dr. Collmann—if we overlook the fact that his statement is speculative on its face, is concerned only with cholelithiasis, or gallstones, and with managing the diabetes and the ulcer by good medical therapy—which means only

good remedial treatment. No details were given as to what such treatment should be, or whether or not claimant was already receiving it from Dr. Shea.

Dr. Obenour, after reviewing many of claimant's afflictions and the possibility of some improvement of them, stated that: "On the basis of the present findings *she might be limited by her pulmonary impairment* from performing heavy work but would not be limited for performing moderate or light work on a sustained basis."

The foregoing shows that one physician employed by the Social Security Administration was concerned with gallstones and corrective surgery and his opinion was that the diabetes and ulcer should be able to be managed by good medical therapy (although he did not know how much insulin claimant was taking at that time); and the other physician employed by the Social Security Administration reported that claimant's only impairment was pulmonary impairment.

The above evidence of Dr. Collmann and Dr. Obenour is not to be taken as substantial evidence controverting the other medical evidence of a greater disability, based on a larger number of disabling factors, of the seven other physicians examining or treating claimant.

As stated in the prevailing opinion, with reference to the evidence of Dr. Collmann and Dr. Obenour, no question is raised as to their competence, integrity, or credibility, and that if there is some degree of conflict between these doctors and Dr. Shea, the claimant's personal physician, he is not persuaded to fault the Examiner for relying on their views.

It is admitted that no question is raised as to the competence, integrity, or credibility of Dr. Collmann and Dr. Obenour. But it does not matter how competent a doctor may be, a single examination by a physician employed by the Social Security Administration, *who saw a claimant only once, as contrasted with the evidence of a practicing physician who had been treating the claimant over*

*a period of years, would not be sustained by substantial evidence.* Teague v. Gardner, 281 F.Supp. 43, 48 (E.D.Tenn. N.D.), Miracle v. Celebrezze, 351 F.2d 361, 379 (C.A. 6), Combs v. Celebrezze, 382 F.2d 459 (C.A. 6), Colwell v. Gardner, 386 F.2d 56, 71 (C.A. 6).

Moreover, Dr. Collmann, on the single examination he made, reported on claimant's diabetes, and stated her diabetes "should be able to be managed by good medical therapy." Dr. Collmann knew nothing whatever about her diabetes except as he said, "by history"—that is, by some report, probably by Dr. Shea, claimant's personal physician. Dr. Collmann said: "She has a history of diabetes for several years." Since he saw her only once, he was telling what he found in some report. He knew nothing about the nature of her diabetes, or whether "it should be able to be controlled by good medical therapy." (Meaning good medical treatment.) How could he know anything about the severity of her disease? He never even took a blood test to ascertain the amount of her blood sugar! In any event, one examination made as a paid representative of the Social Security Administration is not substantial evidence as contrasted with the evidence of continuous treatment during six years by claimant's personal physician; and the same rule of law, substantiated, as cited above, by numerous decisions of the federal courts, without dissent, applies equally to the evidence of the single examination of claimant which was made by Dr. Obenour.

So, in commenting on the statement in the prevailing opinion that if there is some degree of conflict between the evidence of Dr. Shea (the physician who had treated claimant continuously for six years) and these other two doctors, who had seen claimant for a physical examination on one occasion only, we should not fault the Examiner for relying on their views, the answer is that, as against the evidence of Dr. Shea, the evidence of the Social Security Administration's medical witnesses, would not, by the unanimous rule of the federal cases, be sustained by substantial evidence as shown by the authorities above cited.

The medical evidence of a qualified physician, no matter how unquestioned his competence, integrity, or credibility is, who sees a patient with regard to her impairments, diseases, and afflictions on one occasion only, cannot be considered substantial evidence as compared to the evidence of a qualified physician who has been treating a patient for such impairments, diseases and afflictions over a continuous period of six years.

Under this rule, the medical testimony or report of Dr. Shea constituted substantial evidence to support petitioner's claim; the medical report of Dr. Collmann and the medical report of Dr. Obenour do not constitute substantial evidence as against the evidence of Dr. Shea.

An examination of the single examination by Dr. Collmann and the single examination by Dr. Obenour is convincing that, under the recognized law in Social Security cases, their reports cannot be considered substantial evidence as against the evidence of Dr. Shea, Dr. Millis, and all of the other medical evidence in the case. Dr. Obenour and Dr. Collmann did not mention claimant's musculoskeletal disorders, or the uncontrollable nature of claimant's diabetes, or of her bursitis, periarthritis, rheumatoid arthritis, pyelitis, cervical myositis, purulent bronchitis, tendonitis, fibrosis secondary to acute bursitis of left shoulder, chronic backache, osteoarthritic changes of the spine, peripheral neuritis, peripheral anemia, and labile hypertension—all shown by uncontradicted medical evidence.

In determining whether claimant is precluded from performing substantial gainful employment and thus entitled to disability benefits, physicians' testimony as to a partial disability, based upon one disabling factor, is not substantial evidence controverting undisputed testimony of other physicians as to a greater disability, based on a larger number of disabling factors. Social Security Act,

§ 1 et seq. as amended, 42 U.S.C.A. § 301 et seq., Massey v. Celebrezze, 345 F. 2d 146 (6 Cir. 1965).

In 81 C.J.S. Social Security § 44.6 (Cumulative Parts) the general rule is stated:

"When claimant comes forth with evidence of serious physical impairment, the record must contain evidence on which the denial of the claim can be based; and where there is uncontroverted medical testimony that the applicant is unable to engage in any substantial gainful activity it is the duty of the Secretary of Health, Education, and Welfare to award him the relief requested, assuming that all other qualifications are met. The government must adduce evidence from which the finding could be made that claimant can do some type of available work if claimant proves inability to perform the type of work he has done in the past and lack of experience for other work."

The instant case is so similar to Burrell v. Finch, 308 F.Supp. 264 (D.C. Kan.), in which Judge Templar wrote the opinion, that it well merits quoting as being an instance where a claimant was deprived of her just rights by a Hearing Examiner wrongfully ignoring all the medical evidence that confirmed the proven disability claimed by the plaintiff:

"The finding against plaintiff made in this case was arrived at by the simple expedient of excluding from consideration on one pretext or another the medical evidence that confirmed the condition of disability as claimed by plaintiff herself and to which she testified.

"It is not necessary that plaintiff be bed-ridden to come within the statute's provisions. Neither is she required to try to sell apples. She is not required to meet every remote possibility which may be conjured up. The denial of this claim by the Secretary, if it can be supported at all, must rely on the reports of Dr. Sweeney who examined her on two occasions. This doctor managed to report that in his opinion 'this patient is not at the present time (June 1, 1963) totally disabled for gainful employment.' However, this opinion was modified by the statement, perhaps inadvertently overlooked by the Secretary, that this could be done 'with appropriate medical therapy and possibly psychotherapy.' He does not mention what this appropriate therapy might be, and success from treatment not described is speculative to say the least. Dr. Sweeney's second report (July 2, 1965) contains an opinion hedged with 'ifs' and 'possibilities.' A denial of benefits should not be withheld from this claimant on this kind of evidence in the face of the findings of treating physicians and the convincing facts and circumstances of the case.

"This Court is impressed with the admonition contained in Mefford v. Gardner, 383 F.2d 748 (6th Cir. 1967), at 761:

" 'Merely because a physician states that an applicant is not suffering from an impairment that precludes him from engaging in substantial gainful activity, that he has only a slight limitation of activity; and that he should be able to do some work, is not substantial evidence that applicant can engage in substantial gainful activity, when viewed in the light of the evidence of other doctors who had continuously treated applicant, and testified to the contrary, and in the light of the facts reflected in the transcript as a whole.

" 'The foregoing authorities clearly enunciate the law to the effect that it is the duty of courts to examine meticulously the evidence, no matter how burdensome that duty is, because of the helter-skelter nature of the records in these cases, and not adopt the facile way of disposing of an injured applicant's case by reference to, and reliance upon, the statements of one or two physicians,

as against the considered statements of many physicians and surgeons who have had more opportunity of examining and treating the applicant, more occasions of making medical reports upon him, and more expertness in diagnosis, as well as upon consideration of the facts reflected in the transcript as a whole.' "

In the instant case, the foregoing was totally ignored by the Hearing Examiner.

In Massey v. Celebrezze, 345 F.2d 146, 157 (C.A.6), this court held:

"Furthermore, the evidence of some physicians who testify as to a partial disability based upon one disabling factor is not to be taken as substantial evidence controverting the undisputed testimony of other physicians who testify as to a greater disability based on a larger number of disabling factors. So, where a physician testified *that, because of a certain slightly diminished pulmonary capacity,* a man is not disabled from doing certain work, this is not substantial evidence that the man is disabled only to a slight degree, *when compared with uncontroverted medical evidence that the man* is totally disabled because of emphysema, hypertension, tachycardia, osteoarthritis, and other ailments." (Emphasis supplied.)

Dr. Collmann and Dr. Obenour never considered disability resulting from claimant's musculoskeletal or joint disorders. Yet, this was the chief reason for her disability according to claimant's own testimony and the evidence of Dr. Zanolli that she was suffering from sporadic episodes of cystitis, multiple episodes of bursitis affecting her left shoulder, and lower extremity joints, musculoskeletal complaints of a chronic nature, and intermittent back complaints; and, from the evidence of Dr. Shea, that she was suffering from myositis of the left shoulder, chronic backache and peripheral edema, acute low back strain and cervical arthritis.

It was the multiplicity of her complaints upon which Dr. Shea based his opinion that she could only be intermittently or sporadically gainfully employed.

The Hearing Examiner gave no consideration to claimant's disability as resulting from the multiplicity of her complaints.

In determining whether a disability claimant is disabled for social security purposes, inquiry should be directed to the effect of a combination of ailments, not merely the effect of each of them. Dillon v. Celebrezze, 345 F.2d 753 (C.A. 4). In the cited case, the court said:

"Viewing the record in this case as a whole, we do not think it contains substantial evidence to support the examiner's conclusion *that the combination of Dillon's ailments* had not reached such a stage of severity * * that he was precluded from engaging in any substantial gainful activity." (Emphasis supplied.)

The Hearing Examiner in the instant case dismissed all of the undisputed testimony and evidence of claimant's musculoskeletal disorders and chronic joint afflictions, by merely stating that her diabetic problem and exogenous obesity had caused her musculoskeletal disorders, as well as her impaired and continuously deteriorating vision. There was no evidence whatever to support this statement and finding.

As to claimant's testimony of pain and suffering resulting from her various disorders, which was supported by the evidence of her attending physician with respect to the acute nature of her joint and musculoskeletal disorders and her repeated hospitalizations for myositis, chronic backache, arthritis with low back strain, fibrositis and cervical arthritis and uncontrollable diabetes, the Hearing Examiner made no mention except to find that "most of the impairments about which claimant complains and upon which she alleges disability, are remediable." There is no evidence to support this finding in any particular.

With regard to the Hearing Examiner's finding that there was nothing in the record to show that claimant's diabetes and obesity could not be remedied by a limited caloric intake, strangely enough this is contrary to another finding of the Hearing Examiner on the same point that, even when claimant was 40 pounds overweight, her diabetic condition remained mild, as well as the testimony of claimant herself, undisputed by any direct evidence or by any inference to be drawn from the evidence, that "diet don't affect me. They put me in the hospital, and they put me on a calorie diet [of 1500 calories] and I gained four pounds;" that when Dr. Shea "had me on a diet, I just gain"; that he told her the insulin shots definitely made her gain weight; that "when he stepped them up, why my weight shot up." This is undisputed evidence in the record, contrary to the Hearing Examiner's finding that there was nothing in the record "to show that claimant's obesity could not be remedied by a limited caloric intake."

The Hearing Examiner also found that there was some indication that claimant "does not take her insulin with sufficient regularity to keep her diabetes under control." It can be categorically stated that there is no evidence whatever in the record that can be said to remotely sustain this finding.

The Hearing Examiner found that claimant's gastrointestinal, musculoskeletal and vascular disorders are not severe, and that they are secondary to her diabetic and obese condition. There is no evidence in the record to sustain this finding. None of the physicians, neither the physicians employed by the Social Security Administration nor claimant's personal physician, nor the other six physicians, mentioned that claimant's gastrointestinal disorders were "secondary" to her diabetic and obese condition. Dr. Obenour, the Government's physician, never mentioned anything about a gastrointestinal disorder. Dr. Collmann, the other Government physician, a gastroenterologist, said nothing about her gastrointestinal disorder being second-

ary to her diabetic condition. He stated, as heretofore noted in a different connection, that "in spite of the fact she has chronic indigestion and pain throughout her abdomen particularly in the epigastrium, not related specifically to type of food," but stating "if she puts a little bit of food in her stomach she is comfortable and if she puts too much she is uncomfortable or if she is empty she is uncomfortable." Dr. Collmann said nothing about this condition being secondary to her diabetic condition. On the other hand, he considered that her gastrointestinal disorder arose from an ulcer and gallstones, and that the gallbladder disease could be modified by corrective surgery. He mentioned nothing whatever about her gastrointestinal disorder being secondary to her diabetes.

No physician or any other witness mentioned that claimant's musculoskeletal disorders were *secondary* to her diabetic condition. Dr. Obenour stated of claimant: "This patient presents multiple *complaints* referable to the musculoskeletal cardiorespiratory, metabolic and gastrointestinal systems." He never mentioned the word "musculoskeletal" again. He found claimant limited for performing heavy work only because of her pulmonary impairment. But nothing can be gleaned from his report that indicates in any way that claimant's musculoskeletal disorders were secondary to her diabetic condition.

As to the finding of the Hearing Examiner that claimant's diabetes was aggravated by her exogenous obesity resulting in recurrent episodes of acute exacerbations of *vascular disorders,* there is nothing in the case relating to any vascular disorders, or claim of vascular disorders, so this finding is irrelevant as well as without any foundation in the evidence. "Vascular disorders" is a term that seems to have been a phrase abstracted from a medical text; but it nowhere appears in claimant's application for benefits, or in any of the medical reports or testimony.

The Hearing Examiner's finding that, if claimant returned to regular work

with her employer, there is an implication that her employment would be resumed, is totally without evidence to support it, and, in fact, is contrary to the undisputed evidence.

It is absurd to think that claimant would not return to the job for which she was paid approximately $5,000 a year, if she could have done so. She made every effort to do so, and finally gave up the idea only when her attending physician, after all her hospitalizations, ordered her not to go back to work anymore.

It is somewhat illuminating with regard to the Hearing Examiner's attitude toward claimant's application for disability benefits, that, while he based his above-mentioned finding on the obviously unsubstantiated hearsay of claimant's husband that her employer tried to make it rough on her and now had six people doing the work that claimant used to do, the Hearing Examiner ignored, and did not mention, the substantive evidence of claimant's husband that "she's not able to work, that's for sure"; that since she could work no longer at her place of employment, he was obliged to do all the mopping and waxing in their home; that claimant had tried to do these things, "but she wasn't able to make it at all"; that he was afraid she would fall and hurt herself; that he would rather she wouldn't be up trying to do it, because "if * * * she happened to break a leg or arm, why, that—I had just rather she wouldn't be up." When he was at the table on one occasion, he heard her in another room. "We didn't think there was anything wrong with her. When we found her she was in there on the bed." She "blacked out * * * I found her on the bed and she couldn't breath and I rushed her to the hospital. * * * I called the ambulance, and she had to go to the hospital."

The foregoing was important testimony by claimant's husband in support of her application. It was not mentioned, but was ignored by the Hearing Examiner. However, when hearsay testimony on the part of claimant's husband to the effect that her employer made "it rough on her" and now had six people doing the work she had done—of which the husband had no personal knowledge, and which testimony was contrary to the testimony of claimant herself and of the official interviewer of the Social Security Administration—it was nevertheless emphasized by the Hearing Examiner, as evidence militating against her application—"that claimant's inability to work [for her employer] was due to the fact that they had imposed upon her greater burdens than a normal individual with her age, education and training, could be expected to do." This finding was unsupported by any substantial evidence and cannot stand.

The Hearing Examiner's conclusion that claimant's employer wanted to get rid of her by trying to make it "rough on her" is unrealistic and unreasonable in the light of her own testimony that the reason she couldn't do the work was because she couldn't stand it—because her back and legs hurt her so; that up to the first part of 1966 she held out pretty good; then after about six months, "I had it from there out * * just up and down in the hospital, back home." Dr. Shea would keep her off four or five weeks and then she would go back and work awhile, and when she went back she was sick again, and Dr. Shea put her in the hospital and afterward she went back home. She testified that her condition really got bad in 1966, "the last part of it * * *. I would work some * * * and then I was off some, got to where I stayed off so much, well in '66, I was off a lot and so they —I just couldn't make it." She received her pay for June through September 1966, while she was sick and under the care of her doctor and then they just stopped; they "terminated" her. "I didn't get to go back and make it." They terminated her "while I was off sick." They said the termination was because of loss of time—"If I didn't take my early retirement and go on and come home they would in three—three times I'd, you know, been off sick, why they

would lay me off." And they "terminated" her. She told the company: "If that's the way they felt about it, I wouldn't have no other choice." She then received retirement benefits for complete disability—a lump sum of more than $900, her pay and vacation allowance and a pension of $56.37 a month. She further testified that the reason she couldn't do the work—she couldn't hold on, was because of the pain in her back and legs; that Dr. Shea took her off the work and wouldn't let her go back on it.

As additional evidence that claimant's employer did *not* want to get rid of her and was *not* trying to make it "rough on her," the official interviewer of the Social Security Administration reported that claimant's supervisor had told her "to try and take it easy." Her employer obviously considered her such a valuable employee that he paid her regular salary for the last four months with the company although she was unable, because of hospitalization and because of pain, after her return to her home, to do the work; that, when she couldn't return to work after the period of four months above-mentioned, and her doctor ordered her not to return, claimant agreed that she could no longer do the work and was willing to take the pension benefits for her long service.

The Hearing Examiner's finding that, if claimant now returned to regular work with her employer, there is an implication that she would be reemployed, is totally unsupported by any substantial evidence.

The Hearing Examiner found: "It is obvious from claimant's earning record that these intermittent episodes of illness did not significantly affect her ability to engage in substantial gainful activity. Her earnings record reveals that the claimant had not been absent from work to any significant extent since January 1961, until she quit working on June 17, 1966." Claimant herself testified that prior to June 1966, "I hadn't been too regular. I'd been, you know, I was sick so much. Well right

at the first of '66, why I'd held out pretty good; then about six months of it then, I had it from there on out, you know, just up and down in the hospital, back home. He [Dr. Shea] would keep me off four or five weeks then I'd go back and work awhile, and then I went back, I was sick again. He put me in the hospital, and I went home."

She further testified:

"Q. For the first fifteen years that you worked for Union Carbide, did you have much sickness or off from work much?

A. No, no, I made it pretty good.

Q. What about the last five years?

A. The last five years went to going down on me.

Q. And you say it got—when did it really get bad?

A. Well, in '66 and '65, the last of it. I began to get, you know, sluggish. I just begin to—well, I would work some maybe and I was off some. I would work awhile and then off some. Got to where I stayed off so much, well in '66 I was off a lot and so they—*I just couldn't make it.*

Q. When you were off from work, you received full pay?

A. Yeah, the company paid you— the insurance paid me $40.00, and then the company paid me make-up checks, you know. The company pays you so much.

Q. So during the time you were off from work, you received full pay.

A. Yeah, I received my pay, uh-huh.

Q. And you received your full pay from June, the 17th 1966 until when?

A. Well, I received pay up till, I believe it was October. It was the first of October. Now, I ain't for sure, but I think it was.

Q. In other words, even though—

A. That was my last check I got from insurance.

Q. Even though your last day of work was June the 17th because you were sick and under the care of your doctor—

A. Yeah.

Q. And he made the proper report?

A. Uh-huh.

Q. Showing that you were—

A. He sent in all the reports—all the way through.

Q. And you say you were paid up until October, '66.

A. Uh-huh."

We have already rehearsed the numerous times claimant was hospitalized. In April 1966, she was hospitalized for 12 days. In June 1966, she was hospitalized for 4 days. In February 1967, she was hospitalized for 6 days. All during these hospitalizations, her employer paid her full pay. When she was out of work for four months, in June, July, August and September, 1966, because of shoulder pain, her employer paid her full wages. During all the time she was hospitalized prior to 1966, she received her full pay. She had a generous employer. The Hearing Examiner was clearly mistaken when he made the finding that her earning record, during her illnesses, shows that her impairments did not affect her ability to engage in substantial gainful activity. On the contrary, her earnings during her illness did not reflect her ability to engage in substantial gainful activity, because it is undisputed that her employer paid her her full wages during all the periods she was unable to engage in substantial gainful activity. There is no support, therefore, in the evidence for the Hearing Examiner's finding that claimant's illnesses did not significantly affect her ability to engage in substantial gainful activity. The fact was that claimant's illnesses did not affect her employer's generosity in paying her her full wages during the period she was admittedly unable to engage in substantial gainful activity.

The chief, and practically the only, reason for the Hearing Examiner's denial of disability benefits to the claimant is that her diabetes is remediable; that claimant refuses to do anything to remedy her diabetes; and that all of claimant's multitudinous afflictions and suffering over a period of twenty working years are due to her own deliberate acts in refusing to follow Dr. Shea's instructions as to her diet.

In order to arrive at this conclusion, the Hearing Examiner seized upon an isolated statement of claimant that Dr. Shea had her on a diet, but she went "off" because she "got tired" of the dieting— not "plumb off"; and that the last time she saw Dr. Shea he said "stay on what I was on but I've been eating tomato and lettuce and stuff like that and bacon and eggs. That's what he told me to fix and eat, and cottage cheese, and stuff like that, and lettuce." Claimant's testimony that she is eating what Dr. Shea told her "to fix and eat" is not disputed. After claimant's testimony, the Hearing Examiner stated to claimant's counsel that he wanted a further statement from Dr. Shea, saying: "I want information in that statement as to the frequency of [claimant's] visits, the type of treatment he gives on each visit, and what the change, if any, he finds, and whether or not he has had any—made any frequent examinations. Of course, from what she says, I assume that he had had some additional tests made from time to time; and I would like to have a copy of what his records show as findings from the examinations of his tests." The Hearing Examiner then stated to claimant's counsel that within a certain time, counsel could get Dr. Shea's additional statement, and counsel agreed to get the statement. Thereafter, Dr. Shea's statement was given to the Hearing Examiner and filed in the case. The statement showed the diagnoses and all of the dates of claimant's office visits from July 11, 1961, to November 21, 1964, and all of the treatments of claimant from January 1965 to May 17, 1967, including the time claimant's diabetes was out of control, the fact that she was placed on insulin for her diabetes, the report that her blood sugar remained ele-

vated even on insulin; and the fact that, as of the date of the final report, claimant's diabetes was still uncontrolled. In addition, Dr. Shea reported the myriad musculoskeletal afflictions, sufferings and hospitalizations of claimant during the two years and five months prior to the date of this last report.

The Hearing Examiner received all the information which he had requested of Dr. Shea. He specifically asked for every important item that he considered might affect claimant's application, including the number of times claimant had visited him, data showing the frequency of his examinations, and the changes he found in her condition. The Hearing Examiner was not interested in her diet, and, accordingly, did not request that any information be secured from Dr. Shea as to diet. From everything that appears in the case, the Hearing Examiner accepted, at that time, as true, the testimony of claimant that the food she was eating at the time of her testimony before him, was what Dr. Shea told her "to fix and eat"—tomatoes, lettuce, bacon, eggs and cottage cheese—and that Dr. Shea told her she should "stay on" that diet—which she did. The Hearing Examiner received from counsel for claimant all the information he requested. Not then being concerned about her diet, he at no time mentioned that he wanted information from Dr. Shea about her diet, or did he ever point out that such information was not contained in Dr. Shea's report. It was not until the final report of Dr. Shea was filed as the last evidence in the hearing, and after the case was closed and submitted that, two and a half months later, the Hearing Examiner filed his findings and conclusions in which he held that claimant's refusal to follow the diet prescribed by her personal physician resulted in her obesity and diabetes, causing the recurrent episodes of acute exacerbation of gastrointestinal, musculoskeletal and vascular disorders that had been kept under control since the early 1960's—and that there was nothing in the record to show that claimant's obesity could not

be remedied by a limited caloric intake. All of these findings in all of their particulars have been demonstrated to be without any substantial evidence to sustain them. And now, finally, the finding that her diabetes and obesity resulted from failure to follow the diet prescribed by her personal physician, causing all her afflictions and pain, is found to be without any foundation in the evidence; and claimant's testimony that the diet was approved by her personal physician is undisputed, although the Hearing Examiner, in requesting further information from her personal physician, asked for every pertinent bit of evidence of frequency of visits, type of treatment, additional tests made from time to time, findings from the examination of tests, and changes, if any, which he found, and made no request or suggestion as to diet, or inquiry as to whether claimant failed, or did not fail, to follow any prescribed diet, obviously, for the reason that diet, which now looms as the chief, or only, reason on which the Hearing Examiner bases his denial of disability benefits, was never considered at that time of being of any importance.

To deny claimant's application for disability benefits after at least seven years of musculoskeletal afflictions, a diabetic condition which remains out of control even with regularly increased dosages of insulin, and constant pain—on the ground that she is to blame for her diabetic condition, is without support in common sense, or in the evidence, and is an illustration of mistaken administration of the law.

In this regard, the finding of the Hearing Examiner sets forth that, although between April 13, 1965, and August 29, 1966, claimant's weight increased from 163 pounds to 181 pounds— a total of 18 pounds—and that by January 23, 1967, her weight increased another 10 pounds, to a total of 191 pounds —"in spite of this significant increase in claimant's weight, *her diabetic condition remained mild.*" It is impossible to conclude from the foregoing that a reduction of weight would have remedied

claimant's diabetic condition. None of the medical evidence sets forth that reduction of weight would remedy the claimant's diabetic condition—only a speculative statement that some general improvement might be expected from reduction of weight—and the foregoing only adds to the weight of our conclusion that the Hearing Examiner's finding, that claimant's refusal to follow a diet to reduce her weight was a deliberate act on her part to refuse to remedy her diabetes, was without any evidence to support it; and, as heretofore set forth, claimant was undisputed in her testimony that she followed a diet approved by her personal physician.

Once it is seen from the uncontradicted evidence that claimant is not to blame for her diabetic condition; that no matter how much overweight she is, "her diabetic condition remained mild," as the Hearing Examiner found; that claimant's weight increased even on a caloric diet prescribed for her in the hospital; that her weight increased because of the effect of insulin; that there was no evidence of any kind in the case that claimant's diabetes was remediable; that the diet which she followed was approved by her personal physician—then, the Hearing Examiner's finding that claimant's diabetes is remediable, and that all of claimant's pain and afflictions result from her failure to follow the regime for diet and medical control of her diabetes, is without any substantial evidence to sustain it, and the whole case for denying her disability benefits falls apart.

We come, then, to the findings of the Hearing Examiner based upon the testimony of the Vocational Counselor.

Regardless of all the medical evidence and the evidence of Mr. Merritt, who was the interviewer representing the Social Security Administration, and the testimony of claimant and her husband, the Hearing Examiner found that, in spite of her diabetes and musculoskeletal afflictions, claimant, according to a Vocational Counselor, was not precluded from returning to her former type of work as a salad-maker in a restaurant or

cafeteria, or from performing other duties in a restaurant, such as a cashier; that she had failed to present sufficient evidence to establish that she had an impairment or impairments in combination severe enough to preclude her from engaging in any type of substantial gainful activity for a continuous period without interruption of not less than twelve months' duration; and that, in spite of her diabetes and musculoskeletal afflictions, she also had the residual capacity to engage in the further work, concerning which the Vocational Counselor testified, such as a nurses' aide in hospitals or nursing homes.

When, at the close of claimant's testimony, during a colloquy between the Hearing Examiner and claimant's counsel, the latter stated he would like to know what possible "light" work claimant could perform on a sustained basis, the Hearing Examiner replied that "to give you a *scientific correct answer to that question,* I am going to have to call a vocational witness in here."

The vocational witness was William L. Holbert, a teacher at the University of Tennessee in the Graduate Counselor Training Program. He had been given the exhibits or medical and hospital reports with regard to claimant, and a transcript of all the testimony in the case. Armed with this data, he stated he had sufficient information to form and express an opinion with regard to the jobs a person could do who had the claimant's impairments as described in the record.

He was then asked the following question by the Hearing Examiner:

"Q. Assuming that I, as a hearing examiner in this case, should find examination of all the record in this case particularly the medical evidence, that this claimant has had diabetes mellitus, which is controllable by insulin and dieting, and that she is overweight due to what is described as exogenous obesity which can be reduced by caloric intake, and she had had an ulcer, a duodenal ul-

cer, by history of which has given her trouble in the past but can be kept under control by proper medication and dieting, and if she has a chronic upper respiratory infection, which is described as bronchitis, which is severe enough to create a mild obstructive ventilatory insufficiency, which would preclude her from engaging in activity that required her to do any standing on her feet for a period of time; and engaging in sustained work, but that she has the residual capacity to engage in what is commonly described as light sedentary work and that she has been working for a number of years as a salad maker in a cafeteria * * *—twenty years, based on that background of work experience, and with her education as you noticed exists in the record and coupled with the impairments I have just described which imposes the limitations I have just mentioned—inability to stand on her feet or do extensive walking—I may also add bending or lifting. Assuming she can't do those things, there is a functional limitation upon performing of those acts and sustained work, are there other jobs that she would have the residual capacity to perform and which she could adapt her past experience and training and so forth, to?

A. Yes."

Before we proceed to the answer of the Vocational Counselor, it is to be emphasized that, in the foregoing question, addressed to this witness by the Hearing Examiner, he did not include the fact that the claimant had greatly impaired vision, which will hereafter be set forth. Moreover, the Hearing Examiner had assumed, in his question to the Vocational Counselor, that claimant's diabetes was controllable by insulin and proper dieting, when the only evidence of the actual state of her diabetes was the evidence of her personal physician, Dr. Shea, who reported that even after he had changed her treatment from the oral medication of Orinase to insulin, her diabetes was out of control in January 1965 and in April 1966, and that the final evidence received on the hearing was Dr. Shea's reports dated May 17, 1967, in which he stated that, even on insulin, her diabetes was still uncontrollable. Moreover, while the Hearing Examiner stated in his question to the Vocational Counselor that claimant had a chronic upper respiratory infection described as bronchitis, which is severe enough to create a mild obstructive ventilatory insufficiency which would preclude her from engaging in any activity that required her to do any standing on her feet for a period of time, and engaging in sustained work or lifting or bending—this is a garbled hodge-podge of the proofs, since there was no evidence that claimant's bronchitis or ventilatory insufficiency precluded her from standing for a period of time, or engaging in sustained work or bending or lifting. What precluded her from standing for a period of time or engaging in sustained work or bending or lifting was the great number of musculoskeletal and joint disorders that had caused her pain and suffering over a period of years, until she was no longer able to do any work because of them— and musculoskeletal and joint disorders were never mentioned in the questions of the Hearing Examiner or considered in the answers of the Vocational Counselor —all of which were disorders described by five physicians at various times over a six-year period, and some of them being periarthritis, suborbital arthritis, musculoskeletal complaints of a chronic nature, bursitis of left shoulder and lower extremity joints, tendonitis of the shoulders, fibrosis, myositis of the left shoulder, cervical arthritis and many other joint and musculoskeletal afflictions. Why these were not mentioned or considered by the Hearing Examiner or the Vocational Counselor in appraising claimant's disability is unexplained. They

were proved by the uncontradicted testimony of claimant and sustained by the evidence of medical experts. Their existence and severity were undisputed. Were they forgotten or overlooked, or ignored by the Hearing Examiner? Whatever the reason, the failure to consider them resulted in prejudicial error.

We return, then, to the testimony of the Vocational Counselor who proceeded to answer the question of the Hearing Examiner as to what work claimant was capable of performing in the light of her disabilities. The Vocational Counselor's testimony was what the Hearing Examiner described as the "scientific correct answer" to the question asked by counsel for claimant as to what light work claimant could possibly do in her condition. The testimony is as follows:

"Q. (By the Hearing Examiner) * * * I wish you would enumerate such jobs, giving the titles, describe those type of jobs, and the kind of function or activity it required * * *

A. (By Vocational Counselor) After reading the medical record, I went by Byerley's Cafeteria and talked with them about the job of salad girl that they have there."

This seems a strange line of investigation for the Vocational Counselor to pursue, as claimant had been obliged, because of her disability, to quit the identical job of salad girl at the cafeteria where she had been employed for twenty years. Nevertheless:

"Q. Now, where is that?

A. It is out by the U.T. (University of Tennessee) Campus.

Q. It's practically on University Campus?

A. Yes, sir. It's about a block off Cumberland there. I went up there at lunch, and I talked to one of the people that was tending the salad. I didn't get a chance to talk to the manager, but I talked to her about some of the duties that she performs and tried to get an idea of how much physical energy is required as well as psychological relationship with other people, and so forth, (witness has a degree of Doctor of Philosophy in Psychology) and I understand from her that the prime job of salad girl in this particular instance is getting the vegetables prepared; that is, cleaned and ready to go into machines, and they actually have machines that cut up the salad so there is very little lifting, bending. There is a limited amount of walking during the busy hours; that is, during the lunch hour and the evening hour."

The Vocational Counselor also testified that it was necessary for a salad girl at Byerleys to stand about an hour or an hour and a half, twice a day, while serving salads. Some of the time the work could be done seated. However, a salad girl would have to work a forty-hour week—eight hours a day, five days a week. The witness testified he also "looked in the yellow pages, and there are several salad shops, professional salad shops in Knoxville. I called one, Sally's Salad Shop, here in Knoxville and talked to them about the type of work that they perform there. The manager, Mr. Grant Cantwell, wasn't in, and I talked to his assistant, and she tells me that most of their work in the professional salad shop is done by machinery. There is very little lifting. It is primarily—the primary work is getting the vegetables ready and put it in the machine, and they have to package it, and they package the salad to go into super markets. They package it in large containers that go to hotels and restaurants and so forth. * * * "

When the Vocational Counselor was asked "Where is this work done in preparing the vegetables," he replied: "Well, as I say, I didn't go back there, but it's back in the kitchen area. They have sink type set-ups where they wash the lettuce, and they have ice boxes or

cooling places where they keep the vegetables crisp. It is back in the back of the cafeteria there * * *.

"Q. And when they go to get those vegetables—they're in—I think you said a refrigerator?

A. Well, the cooling area. I doubt if it is a refrigerator. It's just a cooling area.

Q. Is this a big walk-in cooler or is it shelf type coolers about the head level or just where would they be?

A. Well, as I say, I didn't go back into the section and look myself. So I'm not sure.

Q. Do you have any idea how many salads they make—the salad girl there prepares them each day?

A. No."

This was the identical work that claimant had been doing for her employer before she became so disabled that she could not work any more. The Vocational Counselor's calling up restaurants and speaking to salad girls and other employees rather than to managers, looking through yellow pages to find how many salad shops there were in the vicinity, and the indefinite and vague information he gave as to their operations and the duties of the employees, throws no light on any important factors in this case—such as how much physical work was necessary, whether a salad-maker had to lift the vegetables on shelves above head level—and whether claimant could, in such a place, engage in substantial gainful activity, as a salad-maker, considering her pain, musculoskeletal afflictions, acute bronchitis, and uncontrollable diabetes.

None of the Vocational Counselor's testimony that claimant could return to her work as a salad-maker in such a restaurant or cafeteria as Byerley's constitutes substantial evidence to sustain the Hearing Examiner's finding that claimant was not precluded, by her impairments, from engaging in substantial gainful activity, especially in the light of claimant's own testimony as to the na-

ture of the work of salad-maker that caused her such pain that she could no longer continue to perform it, all of which was substantiated by the clear weight of the medical evidence.

We shall proceed, then, to discuss claimant's ability to work in a restaurant or cateteria as a cashier, or as a nurses' aid in a hospital, which were two of the positions the Vocational Counselor had stated that claimant could perform. The Vocational Counselor testified with regard to her performing the services of a cashier in a cafeteria:

"It's a matter of learning to use a cash register, know the—remembering the price of each item in the cafeteria line in the case of a cafeteria, and punching it in on the cash register and making change * * *."

Claimant had been only a salad-maker for the twenty years of her working experience, and had never followed any other kind of occupation. A cashier must be a quick-minded person, able to remember immediately the price of numerous different dishes; to punch the proper keys on a cash register; and rapidly make change. It is most unrealistic to propose a job of cashier in a cafeteria for a woman without any such training, whose work experience was completely different up to the hearing, at which time she was fifty-eight years old; and it is unreasonable to think that such a woman, without previous experience, and who is nearly blind, could do the work of a cashier in a cafeteria—a job that, among other qualifications—which claimant does not have—also requires especially good eyesight.

With regard to the work of a paid nurses' aide, the Vocational Counselor was asked:

"Q. Well, in this nurses aide work also, * * * is it not pretty much of a necessity to be able to see well, and to be accurate with what you see such as reading thermometers?

A. Yes, they would have to see a thermometer, and the nurses aide

is usually required to take blood pressures. She is required to take pulse and to see a watch dial on timing, so they would have to see—be able to see."

The Vocational Counselor also testified that in the position of a nurses' aide, claimant would have to do simple mathematics; and that she would have to be able to write notes to the nurses for the hospital records. The examination of the Vocational Counselor continued:

"Q. And it would also seem to me like the sight would be fairly much a prerequisite in cashier work?

A. Yes, they would have to see. I think a person would have to have eye sight enough to see the numbers on the cash register, and of course they would have to inspect the trays and be able to price it out."

Claimant's vision was and is so bad that she can hardly see. Claimant was questioned by the Examiner and was asked:

"Q. Now, you used to drive an automobile?

A. Yeah.

Q. But you haven't driven in about a year?

A. No, I ain't drove in nearly a year.

Q. Why don't you drive?

A. I can't see. Lines run together and I can't see which way I'm going. I can't judge my distance. My eyes just—letters seems like it just gets foggy. I just don't try it.

Q. I see that you are wearing glasses. Does that happen while you are wearing glasses?

A. Yeah. I can't do no good with my glasses, either.

Q. Do you read at home?

A. No, no, not much at all without it's awful big reading and big print, I can see it.

Q. Have you had your eyes checked?

A. Dr. Millis checked them."

Hearing Examiner: "I think we'd better get a report from Dr. Millis * * *."

Counsel for Claimant: "I will talk to Dr. Millis and get a report and send it to you."

Pursuant to the Hearing Examiner's request, Dr. Millis' report was thereafter filed with the Hearing Examiner; and the doctor confirmed claimant's testimony as to her greatly impaired vision. Dr. Millis reported:

"This is a record of my findings:

Vision without glasses:   Rt. eye 20/200
                                Lt. eye 20/200
Vision with glasses:  Rt. eye 20/20
                            Lt. eye 20/30
                          —Both 20/20

"Stereopsis is low; there is a definite vertical deviation in the alignment of her eyes resulting in double vision. The eye pressure was within normal range. Due to the vertical deviation and the inability to see equally as clear out of both eyes, she suppresses vision in her right eye.

"She has a record of variable blood pressure as well as a diabetic condition. Each of which makes it almost impossible to stabilize her visual problem.

"I have been examining Mrs. Jenkins' vision since July, 1963 [4 years]; during this period of time I have observed a general deterioration in her vision."

Here, it should be noted that in the prevailing opinion it is stated:

"Appellant did not claim impaired eyesight in her application for benefits. Eye trouble appeared first as a result of some questions put to her by the trial examiner.

"In her original application for benefits, she described her disabilities as 'diabetes, ulcers, and obesity,' never once mentioning poor eyesight."

The foregoing seems completely unimportant and irrelevant as to the grounds of its consideration, weighing the other testimony and proofs in the case. The evidence was mentioned in this opinion, not to be evidence on which appellant bases her claim of disability, but evidence why she was unable to perform the

jobs that the Vocational Counselor found she could do—and which were dependent on good vision.

First, however, even from the standpoint of considering her double vision and deteriorated vision over a period of four years as a disability, it should be emphasized that appellant's claim was not made out by her, but by a "disability interviewer"; and this is evident by the fact that the handwriting shows that the statements in the claim were filled out by someone in the Social Security office, and that the only handwriting of claimant is seen in her signature to the claim. In petitioner's statement of her claim, she obviously told the disability interviewer that her disabilities were "diabetes, ulcers, and bursitis." The disability interviewer, however, obviously following claimant's statements, checked off a box showing that claimant displayed difficulty with her eyesight, and that she had trouble in writing and "appeared to be in some noticeable physical distress."

Under the rule of informality in making claims and in procedure under the Social Security Act, these items should warrant a claim of impaired eyesight. If the law is to be liberally construed in favor of the claimant, would it not be construed to include such a claim of poor eyesight in the instant case?

The important report of Dr. Millis in this case was obtained and filed only because the Hearing Examiner requested it. Apparently, no one would have thought of getting the report of Dr. Millis at that time, unless the Hearing Examiner directed that it should be secured.

It is to be noted that the Hearing Examiner did not deny petitioner's claim with regard to her deteriorated vision on the ground that she had not described it as one of her disabilities in making her claim. He actually passed on this claim, considering it to be one of the issues in the case. In his decision, the Hearing Examiner stated:

"Since the filing of her application, claimant also complains of poor vision. * * * Again it is noted here that with claimant's full cooperation with her treating physician in following his instructions for controlling her diabetes and obesity, this impairment, too, can be greatly improved and stabilized."

Of course, while the Hearing Examiner referred to this *impairment*, there was no evidence whatever in the case that claimant's poor vision could be improved or stabilized *by following her physician's instructions for controlling her diabetes—or improved or stabilized in any other way*.

Nevertheless, we return to the observation in the prevailing opinion that petitioner never mentioned a claim of "impaired eyesight in her application for benefits. Eye trouble appeared first as a result of some questions put to her by the trial examiner. In her original application for benefits, she described her disabilities as 'diabetes, ulcers and bursitis' never once mentioning poor eyesight."

Since the Hearing Examiner passed on this very issue of poor vision, it is impossible to find in the discussion in the prevailing opinion anything more than expression of the view that the claim of poor vision was an afterthought and not entitled to serious consideration. But can all this testimony on the part of claimant that she did not drive because "I can't see" and her evidence that she had cut herself on the salad-shredding machines because of her poor vision, and all of the evidence of Dr. Millis, be rejected on the ground that claimant did not include "impaired eyesight" in her claim for disability, when such evidence is used—not to establish disability, but to show that claimant cannot perform the work requiring good vision which the Vocational Counselor testified she could do, without any mention by the Vocational Counselor of any knowledge of her undisputed impaired eyesight?

From the prevailing opinion, I conclude it is considered that the question of claimant's poor eyesight does not deserve any consideration in this court. I am impelled to the foregoing conclusion by the statement in the opinion that:

"A total of ten doctors who had examined appellant on various occasions before and after the time of the claimed commencement of her disabilities, filed written reports. These included the several doctors who would see her at a hospital visit. In one report, dated January 23, 1967, [Dr. Obenour's report] there is a notation 'vision reduced in both eyes for about one year.' In another of these reports, the examining doctor includes in his general report of physical examination, 'Pupils are equal, react to light and accommodation * * *. Fundoscope examination is negative.' Other than the foregoing, the doctors' reports make no reference to eye trouble. Her own Dr. Shea, upon whom she had long relied for treatment and upon whom she places chief reliance, makes no mention whatever of impaired eyesight as one of his patient's difficulties."

These observations are without any bearing on this case, and the last observation about Dr. Shea's reports is contradicted by the undisputed evidence.

In the first observation by Dr. Obenour, it is said: "Vision reduced in both eyes for about one year." Dr. Obenour, as stated, had never seen claimant before his examination, and never saw claimant except on this one occasion. What he stated as happening about her vision being, "reduced in both eyes for about a year," was hearsay—he got it from some fragmentary report, perhaps. He had no personal knowledge of such reduction of vision. His statement about reduction of vision is under the heading, "History," which means some inadequate information he had secured from someone else, not named. Why should this statement of Dr. Obenour be given such importance?

In the second observation from the foregoing quotation from the prevailing opinion, it is said "the examining doctor includes in his general report of physical examination, 'Pupils are equal, react to light and accommodation * * *. Fundoscope examination is negative.'" What possible bearing does this report and fundoscopic examination have upon the issue whether claimant's eyesight is impaired by double vision, vertical deviation, impossibility of stabilization of her visual problem, and general deterioration of her vision? Nothing whatever.

A fundoscopic examination is, in other words, an ophthalmoscopic examination. As Webster's International Dictionary states: "the fundus is that part of the eye opposite the pupil"—that is, the ocular fundus, and as further defined therein, an "ophthalmoscope is an instrument for viewing the interior of the eye, particularly the retina."

In the handbook, "Office Management of Ocular Diseases," by Dr. William F. Hughes, published in 1953, Professor and Head, Department of Ophthalmology, University of Illinois College of Medicine, Ophthalmologist in Chief, Illinois Eye and Ear Infirmary, and Attending Ophthalmologist, Presbyterian Hospital, Chicago, he states:

"Ophthalmoscopic examination of the ocular fundus is important not only for the diagnosis and treatment of ocular diseases, but also for the recognition of certain systemic diseases, such as hypertension and diabetes. In this chapter, the important diseases which can be detected by ophthalmoscopic examination will be discussed. Except those conditions which produce clouding of the media (cornea, lens, and vitreous) and abnormalities of the disc and optic nerve discussed in Chapter 14, Neuro-Ophthalmology."

Any fundoscopic, or ophthalmoscopic examination is for the diagnosis of ocular diseases, or conditions that cause the clouding of the lens, cornea and aqueous and vitreous media and abnormalities of the optic disc or optic nerve. None of these diseases, condi-

tions or abnormalities, have anything to do with the condition of claimant's double vision caused by vertical deviation in the alignment of the eyes; and have nothing to do with claimant's general deterioration of vision over a period of several years.

The recital that doctors have filed reports that the "pupils are equal," and "react to light and accommodation," and the "fundoscope examination is negative" is set forth as showing that such doctors are of the opinion that claimant has no impairment of vision. The reports do not say that; and they have no bearing whatever on the undisputed evidence of claimant's double vision caused by vertical deviation in the alignment of her eyes, and her continuously deteriorating vision over a number of years, as well as her own testimony—that is not attacked by any witnesses or evidence, that she can't see well enough to drive a car, and all the rest of the visual deterioration to which she testified.

What bearing does the foregoing fundoscopic examination have on petitioner's claim of deteriorated vision? Doctors who make complete physical examinations are not concerned with whether a patient has good vision. The only examination they make of the eyes is a fundoscopic or ophthalmoscopic examination for the purpose of detecting whether the blood vessels in the eyes indicate hypertension or hardening of the arteries, or diseases of the eye.

The fact that ten doctors examined claimant before and after the commencement of her diabetes, ulcers, and bursitis, and made no mention of her impaired eyesight, is what one would expect from such physicians. The idea, however, that their fundoscopic examinations do not indicate that claimant was suffering from anything which *such* examination would show, does not faintly indicate that claimant was not suffering from impaired vision in view of the fact that Dr. Millis found that for four years prior to the Hearing Examiner's decision, there was a general deterioration of her vision; that there was a vertical devia-

tion in the alignment of her eyes, resulting in double vision; that "due to the vertical deviation and the inability to see equally as clearly out of both eyes, she suppresses vision in her right eye, and that it was almost impossible to stabilize her vision."

Is all of this evidence to be thrown out of the case, *not* because the Hearing Examiner found that it was not included in petitioner's claim for disability, but because after the Hearing Examiner passed on this very issue, this court should proceed to consider that, for the first time in this controversy, it should disregard this evidence on the ground that the claimant did not include poor vision as one of her disabilities?

In the prevailing opinion it is said that "While 'double vision' sounds ominous, standing alone it gives no idea of the import or frequency of such disorder"; "What treatment might be employed to alleviate it is not set out," and "To the layman, 20/20 is normal vision."

With regard to the first observation above mentioned—that "double vision sounds ominous standing alone" and that "it gives no idea of the import or frequency of such disorder," "double vision" is the layman's term for "diplopia," which, as defined in Webster's New International Dictionary, Second Edition, Unabridged, is as follows:

"Double vision of a single object; * * * in crossed * * *, diplopia, the eyes are focused beyond the object and the image seen by the right eye is at the left, that by the left eye at the right. In direct * * * diplopia, the object is beyond the focus and the image seen by the right eye is on the right side, that by the left eye on the left. In vertical diplopia, one image is above the other."

In this case, claimant had vertical diplopia, or vertical double vision.

We take judicial notice of dictionary definitions. There is nothing abstruse about the foregoing dictionary description of double vision. It is easily understandable. Double vision is the disorder

of seeing two images at the same time. Here, Dr. Millis reported that double vision was caused by vertical deviation. As described by the dictionary, vertical diplopia, or vertical double vision, is the disorder which consists of seeing two images at the same time, one above the other. Contrary to the statement that "standing alone, vertical deviation resulting in double vision, gives no import of such disorder," it seems that the evidence clearly discloses that it does give such import—that, in fact, it is an important disorder of vision—to see two images at the same time, one above the other. Moreover, Dr. Millis reported that because of such double vision, "and the inability to see equally as clear out of both eyes, she suppresses vision in her right eye." Dr. Millis also reported that during the four-year period prior to the hearing before the Hearing Examiner, "I have observed a general deterioration in her vision." It appears clear that all of this uncontradicted evidence shows—contrary to the statement quoted above—that the report of Dr. Millis including the statement of claimant's double vision, gives a clear idea of the import of her visual disorder.

With regard to the further statement that the "double vision" reported by Dr. Millis gives no idea of the "frequency of such disorder," is it necessary for a doctor, once he finds a condition of "double vision" and general deterioration of vision over a period of four years, to give an idea of the frequency of such "double vision," or general deterioration of vision? Once it is found that a person is suffering from diabetes or some other disease or chronic disorder, is it necessary for a claimant to assume the further burden of proof to present evidence to show how frequent the disorder is? Is it not enough, in this case, that the claimant shows she has the disorder of double vision from her medical report; that, because of double vision, she can no longer drive a car which she had done for the prior twenty years; that Dr. Millis also reported on the impossibility of stabilizing her visual problem; and

that for the four prior years he had observed a general deterioration in her vision? Does claimant have to produce further evidence to show how *frequent* her disorders are, when no question has ever been raised as to that aspect of her impairments? And does she have to prove "what treatment might be employed to alleviate it"? If so, this is a new principle regarding the burden of proof that has to be borne by a claimant for disability. To deny that petitioner has made any sufficient showing of her physical disorders, because this court, for the first time in the controversy, brings up the objection that she has not shown the frequency of the occurrence of double vision, would seem to be an unconsciously contrived reason to deny her the benefit of undisputed evidence upon which she relies and upon which her claim depends.

It is further stated in the prevailing opinion that on the question of appellant's visual disorders: "[Dr. Shea] states that with glasses Mrs. Jenkins' combined vision of both eyes would be 20/20. To the layman, 20/20 vision is normal vision." This is admitted, and such is normal vision, as the layman understands it. It is only normal "Central Visual Acuity," according to the Regulations of the Social Security Administration, as hereafter discussed. What 20/20 has to do with is Central Visual Efficiency, according to the Regulations. Twenty/twenty vision has nothing to do with other disorders and impairments of vision. A person can have 20/20 vision which means that, in this case, with glasses claimant had 20/20 in her right eye; 20/30 in the left eye, and that the doctor would conclude that 20/30 in the left eye was so close to 20/20 that, for both eyes, the Central Visual Efficiency would be 20/20. Anyone who has ever had his eyes tested knows that one eye is tested while the other is covered; and the other eye is then tested while the first eye is covered. That is why, in this case, the right eye, along with glasses, shows 20/20 vision, and the left eye, along with glasses, shows 20/30 vi-

sion. Each eye obviously may have this degree of vision (Central Visual Acuity). But this means only that each eye (with glasses) shows 20/20 vision for distance. It does not mean that 20/20 vision for each eye is normal vision, when a person is afflicted with the disorder of double vision. For, after finding such 20/20 vision, Dr. Millis went on to report that her stereopsis was low; that she had "a vertical deviation in the alignment of her eyes resulting in double vision. * * * Due to the vertical deviation and the inability to see equally clear out of both eyes, she suppresses vision in her right eye. She has a record of variable blood pressure as well as a diabetic condition, each of which makes it almost impossible to stabilize her visual problem. I have been examining Mrs. Jenkins since July 1963; during this period of time I have observed a general deterioration in her vision."

All of the medical terms used in the foregoing discussion are made intelligible by resort to the Regulations of the Social Security Administration and Webster's International Dictionary; from the testimony of claimant herself about her greatly impaired vision; and from the comprehensive report of Dr. Millis. The statement that "to the layman, 20/20 is normal vision"—while it may be admitted to be the layman's idea of normal vision—does not contradict the undisputed evidence that claimant had severely impaired vision—double vision —general deterioration of her vision over a period of four years, could hardly read, except when she wore very strong glasses, and the print was big, and could not see well enough to drive a car.

Repeating certain facts in a different connection and with regard to a different legal aspect, reference is made to the fact that in the prevailing opinion, it is stated that petitioner "did not claim impaired eyesight in her application for benefits. Eye trouble appeared first as a result of some questions put to her by the trial examiner." It is then said: *"We discuss it only* because the *dissent places great weight upon it."* (Emphasis supplied.)

The only conclusion, it seems, that one can draw from this statement is that the claim of appellant's impaired eyesight is discussed only because the dissent places great weight upon it. This, in fact, is a refusal to consider seriously the claim of appellant's impaired eyesight as an important issue in the case.

The real bearing of the claim of impaired eyesight and the uncontradicted evidence of such impairment go, not to the question whether claimant relied on such impairment as a ground of disability, but whether, after all of the evidence of such impairment was directed to be placed in the record by the Hearing Examiner, claimant is to be told that her claim is only an after-thought, and that she cannot rely on such uncontradicted evidence in order that she may be able to show she could not perform duties which the Vocational Counselor stated she could do as a nurses' aide, and as a cashier, etc., which require good eyesight.

Moreover, in the prevailing opinion it is stated that, at the conclusion of the case, claimant filed her affidavit "which for the first time included a claim that impaired eyesight was a contributing factor to her disability."

In her affidavit mentioned in the prevailing opinion, claimant said:

"As a part of my job in the cafeteria with Union Carbide at Oak Ridge, I had to use certain machines which were used for the purpose of shredding, cutting, and preparing vegetables and other foods for salads.

"I used a big 'buffalo' machine on the job which was a machine that has a blade in a big bowl. The material to be cut was put into this bowl, which in turn cut the vegetables up ready to use in a salad. I had to carry the vegetables and other foods back and forth to this bowl.

"In addition, the cafeteria also had a 'snail-cutter' machine which was a knife or cutting blade in conjunction with a big tub. This was a newer

machine and lettuce, even as much as a case of lettuce, was thrown into this big tub and it shredded or cut the lettuce or other items of food. Of course, this involved considerable amount of lifting and carrying to the machine, which is the same sort of machine that I understand is used in other specialized companies which make salads on a large scale. I have cut myself on these machines on occasion, and to a certain extent they are dangerous for a person with my eyesight, and with my other ailments, which cause me to bleed more easily, to 'black out', etc."

Now, all of the foregoing was admitted in evidence *after* the Vocational Counselor had testified that claimant could do the work of a nurses' aide, cashier in a cafeteria and a salad-maker, and who testified, as an expert, on appellant's job capabilities, without any mention of the prior evidence of claimant's poor eyesight, double vision, and continuously deteriorated vision.

In the prevailing opinion, it is stated that the Hearing Examiner considered the *"late claim* of reduced eyesight specifically." (Emphasis supplied.) After the Vocational Counselor testified that claimant could perform the duties of a nurses' aide, and the other duties mentioned requiring good eyesight, would not claimant have the right to introduce evidence that she did not have good enough eyesight to do that kind of work? It is difficult to discern why it is emphasized that claimant's affidavit "for the first time included a claim" for impaired eyesight, and that the Hearing Examiner's decision considered the *late* claim of reduced eyesight specifically—when any of claimant's evidence in rebuttal to the testimony of the Vocational Counselor would not be late because filed after he had testified, and that any rebuttal of his testimony, necessarily, could only be introduced after he had testified.

Claimant's affidavit, which was introduced into evidence just before the conclusion of the evidence, went on to say that her impaired eyesight has caused her to cut her hands on the knives of the "buffalo cutter" and the "snail-cutter" machines, used in shredding lettuce for salads, and that they are "dangerous for a person with my eyesight." Nevertheless, in the prevailing opinion, it is stated that the Hearing Examiner considered "the late claim of reduced eyesight specifically."

It appears that it is thought that claimant is at fault, first, for relying on evidence of poor eyesight and impaired vision which was brought out by her cross-examination by the Hearing Examiner and, secondly, that she is at fault for relying on evidence she introduced as to her poor eyesight and impaired vision, in rebuttal to the evidence of the Vocational Counselor.

At the risk of some subsequent repetition, it seems necessary at this time to make the following observations:

It is stated in the prevailing opinion that claimant did not, on direct examination, mention eye trouble when asked to give the reasons for her inability to continue working, and it is further stated in the prevailing opinion, as a significant and controlling fact, that "we are not convinced that failure to rely on eye trouble was the fault of appellant's lawyer. The entire record is persuasive of appellant's belated reliance on it as a disability."

The foregoing is, in my opinion, a rather difficult conclusion to follow for these reasons: First, although claimant stated in her "Disability Interview" with a representative of the Social Security Administration that she had difficulty with her eyes ten months before her testimony before the Hearing Examiner, claimant did not base her claim to disability benefits upon her poor eyesight; second, shortly after she testified she had no problems about doing her work at the cafeteria of the Union Carbide Company except pains through her arms and shoulders, and bursitis, she was asked why she didn't drive a car, and she replied because she couldn't see—that the

lines ran together, and she couldn't see where she was going or couldn't judge her distance. It was then that the Hearing Examiner asked her attorney to get a report from Dr. Millis as to the condition of her vision; and as soon as the report was secured, it was filed in the proceedings by the direction of the Hearing Examiner. It seems to be placing an unwarranted emphasis on this statement of applicant's impaired vision to say that "the entire record is persuasive of appellant's belated reliance on it [eye trouble], as a disability." Appellant had not relied upon it as a disability in filing her claim for disability benefits. Her poor vision, however, appeared from her own uncontroverted testimony, and from the conclusive report which Dr. Millis filed, upon the order of the Hearing Examiner. The Hearing Examiner never suggested that claimant's reliance on her poor vision was belated. In his decision, the Hearing Examiner quoted the entire evidence of the statement of Dr. Millis. Not only did the Hearing Examiner quote the entire evidence of Dr. Millis, but undertook to pass upon the question by holding that claimant's visual problem could be greatly improved and stabilized by claimant's following the instructions of Dr. Shea for controlling her diabetes—although there was not the slightest trace of evidence to sustain such a holding. It is clear that no one has ever suggested "appellant's belated reliance on it [eye trouble] as a disability."

However, the result of such a conclusion appears to have the effect of depriving claimant of all of the evidence of Dr. Millis of her impaired eyesight, and her own testimony that she can't see well enough to drive a car, not because it is advanced as proof of disability, but more than that—to rebut the evidence of the Vocational Counselor that her "residual" capabilities include her ability to perform other kinds of work, such as a nurses' aide in taking the temperature of patients by reading finely graduated clinical thermometers, taking a patient's pulse by watching the second hand of a watch while counting the pulse, taking

the blood pressure of patients, or by working as a cashier in a cafeteria, inspecting the food selections, remembering the prices, striking the keys of a cash register, and making change, where, during rush hours, as the Vocational Counselor testified, "They have to do it fairly fast." This kind of work would obviously be beyond the capability of a woman with the poor and continually deteriorating vision of claimant. Even the Hearing Examiner felt that this must be the case, for he found that claimant's poor vision was remediable by following instructions to control her diabetes; and that since it was remediable, and "a remediable condition is not generally considered disabling," "consequently, claimant was not disabled."

Since there is no evidence in the record that the impairment of vision was remediable, but, on the other hand, as Dr. Millis stated, there had been a general deterioration in her vision for the prior four years during which he had examined claimant, neither the majority opinion nor this opinion considers the impaired vision of claimant to be remediable by following instructions to control her diabetes. But the majority opinion is to the effect that the undisputed evidence of claimant's impaired vision must be disregarded because it was belatedly made, as a ground of disability, while this opinion holds that it would be manifestly unjust to disregard all this evidence of deteriorated vision in rebuttal of the evidence of the Vocational Counselor that claimant could perform other jobs that required especially good, or simply good, vision. All of the claimant's testimony of her poor vision, as well as the evidence of Dr. Millis, was introduced before the Vocational Counselor testified. He never mentioned it during his examination as a witness, and the Hearing Examiner never asked him any questions about claimant's impaired eyesight. None of this evidence was thought to be belatedly introduced by the Hearing Examiner, who considered it in his decision. This court cannot strike out this *rebutting* evidence to the disadvan-

tage of this poor woman on the ground that it was belatedly introduced, especially when it was expressly directed by the Hearing Examiner to be introduced during the hearing. Moreover, the evidence of Dr. Millis embraced facts which were favorable to applicant and were uncontradicted. Claimant's own testimony as to her greatly impaired vision was also uncontradicted.

However, it is here to be emphasized that in his examination of the Vocational Counselor, the Hearing Examiner did not include in his hypothetical questions to him, any of these material facts, or any suggestions as to them. It is stated that the Vocational Counselor doubtlessly saw and examined the report of Dr. Millis, but this is very doubtful. However, that fact is not pertinent in any event. For the law in this regard was clearly declared by Judge Judd in Stewart v. Cohen, 309 F.Supp. 949, 956 (E.D.N.Y.) when he stated:

"The form of hypothetical question which the examiner used left out material facts favorable to the plaintiff, as pointed out above. Errors on evidentiary rulings are not usually grounds for upsetting an administrative determination, but the effect of the omissions here was so substantial as to make the examiner's action arbitrary and capricious. 5 U.S.C. Sec. 706(2) (A). It is no answer to assert, as the government does, that the vocational expert had been given the entire record. The hearing examiner's hypothetical question indicated that the only material portions of the record were those which he enumerated in the question."

For the same reason in this case, the omission in the hypothetical questions of all the evidence relating to claimant's musculoskeletal afflictions, which were the chief reasons on which she based her claim to disability benefits was so substantial as to make the Examiner's action in this regard, arbitrary and capricious. Moreover, the hypothetical question of the Hearing Examiner addressed to the Vocational Counselor to the effect that claimant had "diabetes mellitus which is controllable by insulin and dieting," was contrary to the evidence of claimant's attending physician that, at the time of the hearing and for at least two years prior thereto, claimant's diabetes had not been controllable by any of the recognized medical treatments, including Orinase and insulin. This hypothetical question, based on a complete mistake as to the nature of claimant's diabetes, also constituted an arbitrary and capricious action. The omission of material facts favorable to the claimant in each and all of such hypothetical questions, was so substantial as to make, under Stewart v. Cohen, *supra,* the Hearing Examiner's action arbitrary and capricious.

It is here to be noted, in view of the statements in the prevailing opinion, that, although the Act provides that disability means "inability to engage in any substantial gainful activity," it is not necessary that the testimony of witnesses or the medical evidence of disability specifically declare that an applicant is unable, in haec verba, "to engage in any substantial gainful activity." If an applicant testifies that the pain resulting from arthritis, bursitis, or any musculoskeletal affliction prevents her from going through the physical movements necessary in any work she might do or to which she has always been accustomed, and makes it impossible for her to do such work, then it must be agreed that this is evidence of inability to engage in any substantial gainful activity. Likewise, the evidence of an attending physician that, because of the multiplicity of her afflictions—stating what they are —she must stop doing the work to which she has always been accustomed, and can be gainfully employed only for short periods of time, this is evidence, too, of inability to engage in any substantial activity. Employment for short periods of time is not substantial gainful employment since it is considered only intermittent and sporadic and, according to the authorities hereafter cited and

quoted, such employment does not constitute substantial and gainful activity.

Perhaps the most striking aspect of the entire case is that the testimony of claimant as to her impaired vision, her inability to see in order to drive, her visual impairment causing her to cut her hands on the slicing machines, and the evidence of Dr. Millis of her double vision, suppression of vision in one eye, and general deterioration of her vision over a period of four years, is *completely undisputed and uncontradicted,* and there is no testimony or medical evidence that, even inferentially, casts any doubt upon this undisputed evidence.

The only action of the Hearing Examiner with respect to appellant's claim of impaired vision was to *ignore* all the evidence supporting such claim.

When the Vocational Counselor was sworn, although the Hearing Examiner then had all the evidence of claimant's impaired vision before him, he examined the Vocational Counselor to secure evidence as to what claimant could do, considering her diabetes, inability to stand on her feet for any length of time, "coupled with the impairments I have just described which impose the limitations I have just mentioned—inability to stand on her feet or do extensive walking —I may also add bending or lifting. Assuming she can't do those things, there is a functional limitation upon the performing of those acts, and sustained work, are there any other jobs that she would have had the residual capacity to perform and which she could adapt her previous experience and training and so forth, to?"

The Vocational Counselor was the expert witness whom the Hearing Examiner had previously so described, who was to give evidence as to what "residual" work claimant could perform, and the evidence of what she could do was to be introduced in his testimony in response to the hypothetical questions addressed to him by the Hearing Examiner. Never, at any time, was the Vocational Counselor asked by the Hearing Examiner whether his views as to what claimant could do in residual jobs would be affected by the uncontradicted evidence of claimant's double vision, general impairments in her eyesight, and general deterioration in her vision for the prior four years, and inability to drive a car.

At no point, in spite of the uncontradicted evidence of claimant herself and Dr. Millis, did the Hearing Examiner ever include any mention of petitioner's claim and the evidence of her deteriorated vision, or any mention of it, in his hypothetical questions to the Vocational Counselor.

The only purpose of having the testimony of a Vocational Counselor is to secure his evidence in answer to the hypothetical questions addressed to him. He is a vocational man. He is not a medical man. He has no medical expertise. The only "residual" jobs which the Vocational Counselor testified that the claimant could perform were jobs that required good eyesight.

The rebuttal or failure of the Hearing Examiner to submit any questions to the Vocational Counselor regarding the undisputed evidence of claimant's deteriorated vision was reversible error.

Why did the Hearing Examiner fail to submit any questions to the Vocational Counselor as to claimant's impaired vision? It appears that he must have forgotten all about this evidence.

In the prevailing opinion it is stated that the optometrist's report was received in evidence and that "we assume that the vocational counselor had examined the optometrist's report prior to his conclusion that Mrs. Jenkins could be gainfully employed."

There are no grounds for assuming that the Vocational Counselor had examined the optometrist's report prior to his conclusion that Mrs. Jenkins could

be gainfully employed. The report of Dr. Millis, the optometrist, was received in evidence immediately before the Vocational Counselor was sworn as a witness. It was marked by the Hearing Examiner as "Exhibit 22." No further mention of it was made during the hearing, all of which was transcribed. In receiving it into evidence, the Hearing Examiner said that the vocational witness will want to examine it as part of the medical evidence in this case. There is no indication in the entire transcript that the Vocational Counselor ever examined this evidence of Dr. Millis. He never mentioned it during the hearing or afterward, and the Hearing Examiner never mentioned it during the hearing. The Vocational Counselor never commented on what "double vision" meant, or what "definite vertical deviation in the alignment of her eyes" meant, or why, because of her inability to see equally clearly out of both eyes, she would suppress vision in her right eye, or upon anything else concerning the admitted general deterioration of her vision during the prior four years. There is no ground for assuming that the Vocational Counselor examined Dr. Millis' report prior to his conclusion that claimant could act as a nurses' aide in reading clinical thermometers, in taking the pulse of patients while watching the movement of a second hand on a watch, or acting as a cashier in charge of the cash register in a cafeteria.

When the Hearing Examiner came to write his decision, there was the report of Dr. Millis before him. He then felt called upon to make some finding with regard to the undisputed evidence of claimant's impaired vision. So he made the finding that, in spite of her poor visual condition, "it is noted that with full cooperation of her treating physician in following his instructions and controlling her diabetes and obesity, this *impairment*," as he described it "too, can be greatly improved and stabilized."

The Hearing Examiner, in his decision, affirmed in the prevailing opinion, was also guilty of reversible error in *ignoring* the undisputed fact that, at the time of his findings and at the time he examined the Vocational Counselor, claimant's diabetes was out of control even with the treatment of insulin, and had been out of control for several years. Dr. Shea, whose report of May 17, 1967, was requested by the Hearing Examiner, set forth that in January 1965, her diabetes was out of control; that in May 1966, she was placed on insulin for her diabetes; that throughout May 1966 her blood sugar remained elevated, even on insulin, and that in February 1967 her diabetes was still uncontrolled. All of the foregoing was undisputed.

In May 1967, in his hypothetical question to the Vocational Counselor, the Hearing Examiner stated, among other matters: "Assuming that I, as a hearing examiner in this case, should find (upon) examination of all the record in this case, particularly the medical evidence, that this claimant has had diabetes mellitus, which is controllable by insulin and dieting," etc. This question was part of the basis on which the Vocational Counselor found that claimant was not suffering any disability. But the undisputed evidence was that, for nearly two years before that time, claimant's diabetes was not under control—or controllable—and that, when the Hearing Examiner put the hypothetical question to the Vocational Counselor, assuming that claimant's diabetes was controlled by insulin, the diabetes was still uncontrolled even with insulin treatment. There was no basis for the Vocational Counselor to find that claimant was not suffering a disability because her diabetes was under control. This was contrary to the undisputed medical evidence at the time the Vocational Counselor was examined.

Moreover, in his findings, the Hearing Examiner stated that, since claimant was found to be a diabetic in November 1959, her diabetes had been kept under control by diet and oral medication, but in April 1966 the diabetes "was out of

control when she was hospitalized and put on insulin. By January 23, 1967, the claimant had gained another ten pounds." But it was undisputed that her weight would increase with the taking of insulin, and that her attending physician had pointed this out to her. Then comes the totally unsupported finding to cut down claimant: "There is also some indication that she does not take her insulin with sufficient regularity to keep her diabetes under control." It seemed unbelievable that such a finding, damaging to claimant's whole case, could be made without any evidence to sustain it. But there is no evidence whatever to support it.

In the Hearing Examiner's final findings of fact, he states:

"Claimant has had a history of mild diabetes since late 1959 which has been managed by oral medication. * * * The claimant is obese and her diabetes got out of control intermittently."

This is directly contrary to the evidence of Dr. Shea, the last evidence introduced in the case—and undisputed evidence—that in January 1965 her diabetes was out of control, that even with the use of insulin it could not be controlled, and that at his last examination of her in February 1957, "her diabetes is still uncontrolled." In the face of this undisputed evidence, how can this court accept the final finding that claimant had had a history of mild diabetes, and that it got out of control intermittently? The intent of the Hearing Examiner's finding, made to bolster the decision, is that claimant was not suffering from uncontrollable diabetes—but that the only evidence in the case shows that she was. Contrary to this finding, the undisputed evidence showed that claimant's diabetes did not get out of control intermittently. It was a disease that continued to become worse and, according to the undisputed evidence, was finally for the last two years, out of all control even with insulin.

"Vision" is described as "central" or "peripheral," in the Regulations hereinafter mentioned. "Central," as used anatomically and physiologically, means "distinguished from peripheral." Webster's New International Dictionary, Second Edition, Unabridged. "Visual acuity" is defined as: "Sharpness of vision in respect to the ability to resolve detail." Ibid.

The Hearing Examiner's finding that claimant's "poor vision is correctible with glasses to 20/20 in the right and 20/30 in the left" means only that "her Central Visual Acuity" is correctable with glasses. Central visual acuity results in the ability to distinguish detail and to read and do fine work; and loss of central visual acuity may be caused by impaired distant vision or impaired near vision. It has nothing to do with vertical deviation resulting in double vision.

In the Regulations of the Social Security Administration, Title 20, Section 404.1538, Appendix, Section 2.00, it is provided:

"A. Causes of disability. Disease or injury of the special sense organs may produce disability by reduction of the ability to see or hear. *Loss of central vision* results in inability to distinguish detail and prevents reading and fine work. Loss of peripheral vision restricts the ability of an individual to move about freely. * *

"B. Central vision acuity. A loss of central visual acuity may be caused by *impaired distant and/or near vision*. However, for an individual to meet the level of severity described in Sections 2.02 and 2.04 only the remaining central visual acuity for distance of the better eye with best correction using the Snellen test chart may be used."

Section 2.02, above mentioned, applies to impairment of the central visual acuity; and Section 2.04 applies to loss of visual efficiency.

Section 2.09 sets forth the Snellen test chart headed:

"PERCENTAGE OF CENTRAL VISUAL EFFICIENCY CORRESPONDING TO CENTRAL VISUAL ACUITY NOTATIONS *FOR DISTANCE* IN THE PHAKIC AND APHAKIC EYE (BETTER EYE)" (Emphasis supplied.)

Under this heading, the Snellen Test Chart is as shown in the margin.[2]

Section 2.00 C. is concerned with cause of disability due to loss of peripheral vision. It provides:

"*Field of vision.* Disability due to loss of peripheral vision may result if there is contraction of the visual fields. The contraction may be either symmetrical or irregular."

The Section then proceeds to outline the tests to show such disability due to loss of peripheral vision. The instant case is not concerned with Section 2.00 C., where disability is due to loss of peripheral vision.

Claimant's central visual acuity is measured both for distance and for near vision, using the Snellen notation, each eye being measured separately, and correction of the loss of claimant's visual acuity was corrected by glasses. However, as Dr. Millis reported, claimant's stereopsis, or depth perception, is low, which is the reason for her not being able to judge distances; and she has a definite vertical deviation in the alignment of her eyes resulting in double vision, or diplopia. "Diplopia" is defined in Webster's New International Dictionary, Second Edition, Unabridged, as follows:

"Double vision of a single object; esp., Med., when constituting a disorder of sight. In *crossed, or heteronymous, diplopia*, the eyes are focused beyond the object and the image seen by the right eye is at the left, that by the left

| 2. | Snellen | Percent central visual efficiency | | |
|---|---|---|---|---|
| | | | Aphakic | Aphakic |
| English | Metric | Phakic [1] | Monocular [2] | Binocular [3] |
| 20/16 | 6/5 | 100 | 50 | 75 |
| 20/20 | 6/6 | 100 | 50 | 75 |
| 20/25 | 6/7.5 | 95 | 47 | 71 |
| 20/32 | 6/10 | 90 | 45 | 67 |
| 20/40 | 6/12 | 85 | 42 | 64 |
| 20/50 | 6/15 | 75 | 37 | 56 |
| 20/64 | 6/20 | 65 | 32 | 49 |
| 20/80 | 6/24 | 60 | 30 | 45 |
| 20/100 | 6/30 | 50 | 25 | 37 |
| 20/125 | 6/39 | 40 | 20 | 30 |
| 20/160 | 6/48 | 30 | — | 22 |
| 20/200 | 6/60 | 20 | — | — |

| Column | Use |
|---|---|
| [1] Phakic | 1. A lens is present in both eyes. |
| | 2. A lens is present in the better eye and absent in the poorer eye. |
| | 3. A lens is present in one eye and the other eye is enucleated. |
| [2] Monocular | 1. A lens is absent in the better eye and present in the poorer eye. |
| | 2. The lenses are absent in both eyes; however, the central visual acuity in the poorer eye after best correction is 20/200 or less. |
| | 3. A lens is absent from one eye and the other eye is enucleated. |
| [3] Binocular | 1. The lenses are absent from both eyes and the central visual acuity in the poorer eye after best correction is greater than 20/200. |

eye at the right. In *direct, or homonymous, diplopia* the object is beyond the focus and the image seen by the right eye is on the right side, that by the left eye on the left. In *vertical diplopia* one image is above the other."

In Section 2.01, the "Category of Impairments, Special Sense Organs," is set forth. In Section 2.05, one of these impairments is *"Complete homonymous hemianopsia,"* or half sight, or vision, of uncrossed images of an object *seen double*; where the image seen by the right eye is on the right side and that by the left, on the left side; and when one image is above the other, the result is vertical diplopia, as above defined.

From the foregoing, it is clear that the Hearing Examiner's conclusion that Dr. Millis found that claimant's *poor vision* could be corrected with glasses to 20/20 in the right and 20/30 in the left is not sustained by substantial evidence, since Dr. Millis found that her stereopsis was low; that there was a definite vertical deviation in the alignment of her eyes, resulting in double vision, and that her vision had deteriorated during the four-year period he had examined her—all of which resulted in her poor vision and none of which was corrected by glasses— and resulted in a condition in which she could hardly see big letters with strong glasses, and could not see where she was going when she had tried to drive her car.

It seems impossible that any reasonable person would consider that a woman of such poor eyesight would be able to engage in substantial gainful employment as a cashier, using a cash register, where a mistake in striking a key would result in mistakes or losses; where she must see on a tray all the dishes selected by a customer, must remember the prices of all the different items and must make change immediately for the many items purchased. It would be absurd to confide to such a nearly blind person the duty of a nurses' aid, which requires reading the finely graduated marks in taking temperatures of patients, counting the seconds on the dial of a watch while taking pulse; dong simple mathematics, and writing notes to the nurses for the hospital records. However, where the qualification of eyesight is required, Vocational Counselors and Hearing Examiners are often singularly blind.

In Massey v. Celebrezze, 345 F.2d 146, 150 (C.A. 6), all "of the doctors reported also on the fact that Massey had lost an eye, which, he had testified, resulted from an explosion. One doctor said that Massey had poor vision in the other eye; another doctor said the remaining eye was defective; and another doctor said he had corrected visual acuity of 20/100 in the remaining eye." The Vocational Counselor had stated that claimant could have performed the job of a watchman or of a flagman. On review of the disallowance of benefits, this court, in the *Massey* case, stated:

"On cross-examination by Massey's attorney, Dr. Runyan was asked whether he would 'recommend this man with just one eye and with his lung condition to a prospective employer for a job as a night watchman or a flagman on a road project, in view of his visual problems and employment problems,'— and counsel added to his question: 'If you were called upon as an expert by a prospective employer to interview this gentleman and such an interview revealed that you obtained the knowledge that you have here today and were then to make recommendation to this prospective employer as to whether or not it would be feasible, economically feasible, to hire this man as an eye-by-night watchman or flagman on the road, what would your recommendation be?' Dr. Runyan's reply to this question was: 'Well, I'd look at it this way, as I understand it, I'm to point out the residual factors that he has that can be useful, as to whether they take him or not, that will be up to the employer, * * *' Counsel for Mr. Massey, not receiving a direct answer to his question, pursued the subject by asking:

" 'Counsel: Can I assume from that answer that you would recom-

mend to a prospective employer that [he] would let the man be employed either as a night watchman or a flagman?

Witness: That isn't in the realm of my duty here today, as I understand what I'm supposed to do is to point out things that he can do at the present time that are required in different types of occupations and I would indicate that he does have a vision comparable to what he had before his injury and he was able to be employed in the mines with its heavy equipment, it's reasonable to assume that he would be—well, let's put it this way, that his vision would not be—would not preclude him from being employed.'

"Obviously, Dr. Runyan would not have recommended a man like Massey, blind in one eye, and with defective vision in the other, as a night watchman or a flagman; but he had listed the job of night watchman and flagman, as a job within Massey's capability, and he refused to give a candid answer to counsel's question, when it appeared that such a job for a man in Massey's condition would be absurd."

In Miracle v. Celebrezze, 351 F.2d 361, 381 (C.A. 6), the court was confronted by a similar situation in which it was observed:

"There was the evidence of the 'Vocational Counselor,' who has become a stock figure in these cases, and who, as usual, availed himself of the U. S. Dictionary of Occupational Titles to point out what work was available, but his testimony was no more impressive than that of the Vocational Counselors in Massey v. Celebrezze, *supra,* and Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4); and his evidence carried no weight. As an instance, the Vocational Counselor felt that among the types of light work which appellant could perform was that of a night watchman—a rather peculiar occupation for a man whose eyesight was so poor he could not hold down a job of sweeping or dusting machines because he could not see whether or not the dust was removed. Moreover, the Vocational Counselor thought appellant could do the work of a flagman, except for prolonged standing. When asked by appellant's counsel whether it would affect appellant's ability to perform such jobs, while he was taking the heavy dosages of drugs and sedatives, already referred to, the Vocational Counselor's answer was that 'for some employers, this would make a difference, I suspect, for others I doubt that it would however.' Other jobs which the Vocational Counselor suggested for appellant were equally absurd—armature winding, tool grinding, assembling and repair of electrical equipment, spray painting, 'a kind of bench work in some industries,' machine tending, 'the kind of thing where the worker, the employee, trouble shoots the machine, *keeps an eye on it* to see that everything is running properly.'" (Emphasis supplied.)

The foregoing cases seemed to reach the height of absurdity in holdings of Hearing Examiners that the residual capacity of a nearly blind person included the ability to perform work which required unusually good eyesight.

Although the Hearing Examiner specifically requested the above-mentioned report from Dr. Millis as to claimant's vision, he emphasized in his findings that claimant "had sought no medical treatment for this condition." This was the first and only time that "medical treatment" was mentioned. Although the Hearing Examiner questioned claimant at length during her testimony on many aspects of her complaints and disabilities, he never asked her whether she had sought medical treatment for her impaired vision. The only report sought by the Hearing Examiner on the subject of claimant's vision was his *specific* request for the report of Dr. Millis. This was the only evidence in which the Hearing Examiner was interested on the issue of claimant's vision. But after the hearing was closed, when the Hearing Examiner found that there was no evidence in the

case contradicting claimant's testimony that she could hardly see, and the evidence of Dr. Millis supporting her testimony of her greatly impaired vision and giving the reasons therefor, this whole question had to be taken care of in some way to sustain a denial of disability benefits.

The first step the Hearing Examiner followed was the statement, detrimental to claimant, that she had never sought medical treatment for her condition— although the Hearing Examiner had referred, during the hearing, to the "statement from Dr. Fred Millis, Optometrist" * * * "as part of the *medical* evidence in this case." In this last statement, he was correct. The other statement of the Hearing Examiner that claimant had never sought medical treatment for her condition seems incredible in the light of the fact that the Hearing Examiner made only one specific request, and that was for the additional report of Dr. Millis. Moreover, when he came to reduce his findings and conclusions to written form, the Hearing Examiner seems not to have been aware of the fact that under the new regulations of the Social Security Administration, *medical evidence* shall include "in cases involving visual impairments, the measurement of visual acuity and visual fields *reported by a duly licensed optometrist* * * *." 20 CFR 404.1524.

Further, with regard to claimant's greatly impaired vision, the Hearing Examiner found: "Again it is noted here that with claimant's full cooperation with her treating physician in following his instructions for controlling her diabetes, this impairment, too, can be greatly improved and stabilized." There was no evidence to sustain this finding.

The Hearing Examiner disposed of one of claimant's serious complaints as follows: "Her complaints of smothering etc. were considered due to chronic bronchitis which is not severe enough to cause more than a mild obstructive ventilatory insufficiency which does not preclude her from performing moderate or light work on a sustained basis. Moreover, claim-

ant's bronchial condition is aggravated by her continuing to smoke. * * * "

There is no evidence that her complaints of "smothering" were considered due to chronic bronchitis. Dr. Obenour gave it as his opinion that she had an "upper respiratory infection" because of her "elevated white count." His study of her pulmonary function was "consistent with mild obstructive ventilation insufficiency." Her smothering spells would occur on exertion or at rest. They had no connection with her bronchitis.

On the hearing, the Hearing Examiner was of the opinion that the "smothering spells" were due to claimant's nervous condition. Claimant testified:

"Q. I think I've read something in your reports that you also had problems with smothering?

A. Yeah.

Q. Explain about that.

A. Well, I just smother, just seems like I can't get my breath. I just smother down. I get up and walk and sometimes it will get, you know, cleared up and sometimes it don't. I had one spell at the table and the doctor said it was nerves. I don't know what what it was. He said it was nerves.

Examiner: *That verified what I was telling you just a few minutes ago.*"

The Hearing Examiner had no medical expertise, but he at that time believed, and agreed with what claimant's doctor had said was the cause of her smothering spells—nervousness, for which she was not to blame. In his findings, however, he found her smothering was the result of her bronchitis, for which, he held, she was to blame, because of her smoking. There was no evidence that claimant's smothering spells were caused by her bronchitis. The only evidence was that they were caused by her nervous condition that had existed for many years.

The Hearing Examiner found that the examining physicians, and claimant's

personal physician, "are unanimous in their findings that even though the claimant *does not have the residual capacity to engage in productive substantian gainful activity* requiring physical exertion or labor for any prolonged period of time, *neither of them rule out claimant's residual capacity to be gainfully employed* in performing moderate or light work on a sustained basis. In fact, they indicate she has the capacity *to engage in moderate light work on a sustained basis.*" Here, among other misconceptions, including the erroneous statement that claimant's personal physician made any such findings, the Hearing Examiner failed to note the provisions of the Act with regard to what constitutes disability.

In Dunn v. Folsom, 166 F.Supp. 44, 49 (D.C.Ark.), the court correctly observed:

"It should also be noted that the word 'substantial' as used in Secs. 416 and 423 does not modify 'gainful', but rather modifies 'activity'. The activity in which the plaintiff must be able to engage must not only be 'gainful' but it must also be 'substantial'. The determinative factor here is not how substantial the gain is, but how substantial the activity in which the plaintiff could gainfully engage."

In his finding above referred to, the Hearing Examiner stated that even though the physicians found that claimant *does not have the* residual *capacity* to engage *in substantial gainful activity*, they did not rule out her residual capacity to be gainfully employed in performing moderate or light work on a sustained basis, and that they indicated that she had the capacity to work on a sustained basis.

It is not sufficient that claimant has the *residual* capacity to be *gainfully* employed or that she has the capacity to engage in *moderate light work* on a sustained basis. She must not only have the capacity to engage in gainful activity, but in substantial activity. Failing that standard of capacity to engage in substantial activity and in gainful activity,

claimant comes within the definition of disability under the provisions of the Act and becomes entitled to disability benefits.

The Hearing Examiner found that "the presence of an organic basis for the multiple complaints which claimant had made involving diabetes, gastrointestinal disorders, and bursitis, etc., is not sufficient to establish disability within the meaning of the Act." He bases this view upon the ground that "the mere presence of a disease or medically determinable impairment does not automatically entitle a claimant to a disability period or disability insurance benefits under the Social Security Act * * *. Upon consideration of all the evidence of record in the case, the hearing examiner has become convinced that most of the impairments about which the claimant complains and upon which she alleges disability are remediable * * * [and] a remediable condition is not generally considered disabling and that her chances for obtaining the same type of work in which she had previously engaged would be increased if she lost weight. *Consequently*, claimant was not disabled and not entitled to a period of disability and disability benefits."

This entire foregoing finding is based on the conclusion that since all the impairments upon which claimant bases her claim of disability are remediable, such disabling conditions are not considered disabling (since they are remediable) and, therefore, claimant is not disabled from engaging in substantial gainful activity. The fatal defect in this conclusion is that there is no substantial evidence that all or any of the impairments, on which claimant bases her claim for disability, are remediable. There is no evidence contradicting the statements of claimant's attending physician, introduced during the hearing, that claimant's diabetes was at that time uncontrollable, and had been out of control for the prior two and a half years. Moreover, the evidence of Dr. Shea that because of a multiplicity of ailments, including musculoskeletal and joint disorders, claimant

could perform only sporadic, intermittent work for short periods of time, was undisputed, as was the evidence of Dr. Zanolli that claimant had musculoskeletal complaints of a chronic nature, intermittent back complaints, multiple episodes of bursitis, particularly affecting left shoulder and lower extremity joints, and it is notable that neither of the Social Security Administration physicians reported anything about the musculoskeletal and joint disorders which were the principal cause of disability.

From the foregoing, it is clear that there was no evidence to sustain the Hearing Examiner's findings that all the impairments suffered by claimant were remediable, and that, therefore, claimant could not be considered disabled because of such impairments.

The Hearing Examiner's final blanket finding that, at no time, was claimant precluded from engaging in substantial gainful activity for a continuous twelve-month period prior to the time of his decision, is not only not sustained by substantial evidence, but is contrary to all that appears from the Hearing Examiner's conclusions, remarks, and hypothetical questions to his expert witness, during the entire course of the hearing. The Hearing Examiner had insisted that claimant's impairments were remediable; that her diabetes could be remedied by diet; that her musculoskeletal afflictions —and her great impairment of vision— resulted from her diabetes; and, in his hypothetical questions which he addressed to his expert witness, the Vocational Counselor, he described the condition of claimant as precluding her from engaging in activity that required her to do any standing on her feet "for a period of time, and engaging in sustained work," and in ability to do extensive walking, or bending, or lifting. All of the Hearing Examiner's own conclusions thus expressed during the hearing, and the undisputed medical testimony with regard to claimant's condition during the twelve months prior to the Hearing Examiner's decision show that she was disabled from substantial gainful activity.

However, because of the evidence of the only two medical witnesses on whom the Hearing Examiner relied, we revert to their medical reports, and the law applicable to their consideration.

We have mentioned the speculative statement of Dr. Obenour that claimant might be limited by her *pulmonary* impairment from performing heavy work, but would not be limited for performing *moderate or light* work on a sustained basis; and Dr. Collmann's statement that until claimant had a surgical operation for her gallstones she "probably has *some* degree of restriction until that time," but would have no restriction thereafter.

Even though the evidence of Dr. Obenour and Dr. Collmann did not indicate any consideration or recommendation as to any of claimant's musculoskeletal and joint disorders, which were the principal causes of her disability, the statements that claimant would not be limited from performing moderate or light work, or would probably have some degree of restriction until a surgical operation, did not constitute substantial evidence upon which to base any findings on their testimony; and the statement of either of these physicians that claimant was not suffering from an impairment that precluded her from engaging in substantial gainful activity; that she had only a slight limitation of activity; and that she should be able to do some work, is not substantial evidence that the claimant could engage in substantial gainful activity when viewed in the light of the evidence of another doctor, or other doctors who had continuously treated claimant and testified to the contrary, and in the light of facts reflected in the transcript as a whole; and the foregoing rule is unanimously declared as the law in the numerous leading cases that have passed upon the question.

The general statement of a physician that a claimant could perform "light work" is not substantial evidence that he is able to engage in substantial gainful activity. In Clemochefsky v. Cele-

brezze, 222 F.Supp. 73, 78 (D.C.Pa.), the court said:

"Once proper medical evidence, buttressed by subjective evidence from claimant, has shown a sufficiently severe impairment, it must be determined if such impairment, plus claimant's educational and work status, preclude any substantial, gainful activity. Blankenship v. Ribicoff, 206 F.Supp. 165 (S.D.W.Va.1962). In cases of this kind, where the claimant alleges inability to engage in substantial, gainful activity, *and his personal physician, the man in whose charge claimant has entrusted his health, claims likewise, if examining physicians are to dispute this contention, they must give the medical basis for their opinions. It is not sufficient to say that a man suffers some form of physical impairment yet can do 'light work.'* It must be shown medically that he can perform the physical activities certain jobs require without serious aggravation to present physical impairment or to general health. Otherwise, the Hearing Examiner's findings would amount to pure speculation." (Emphasis supplied.)

In Popovich v. Celebrezze, 220 F.Supp. 205, 207 (D.C.Pa.), Chief Judge Gourley was called upon to determine whether the testimony of an expert medical witness, that an applicant "could do light work," constituted "substantial evidence" to support a finding that claimant was able to engage in substantial gainful employment, and he held that such testimony did not constitute such substantial evidence. In determining the case, Judge Gourley said:

"Of the nine medical and hospital reports from five different doctors, none of whom was the personal physician of the claimant, and one hospital, only one doctor affirmatively indicated an ability to do even 'light work,' and none of them even implied that claimant was not continuing to have difficulty with his back. Even Dr. Stuart N. Rowe, who felt that claimant could do light work, found atrophy in the left lower leg and an indentation at L–4, L–5, and gave a diagnosis of

'? Recurrent herniated disc
 ? Epidural scar,'

stating that patient may require further surgery in the future.

"The statement of Dr. Rowe that claimant can do light work cannot be deemed 'substantial evidence' on which to rest the finding that claimant is able to engage in substantial gainful activity, for the reason that the bald statement of Dr. Rowe that claimant 'could do light work' does not even purport to define the extent to which claimant can do light work. Dr. Rowe, in his medical report, expresses no opinion as to whether the claimant is one of that class of persons who have sustained an injury but are capable of steadily performing certain types of light work which are presumably available and procurable, or whether he is one of that class who are not able, uninterruptedly, to do even light work owing to their physical limitations, a person labeled in Pennsylvania as 'a nondescript.' See Stewart v. Commonwealth, 198 Pa.Super. 261, 182 A.2d 100 (1962). Absent such a definition of the extent to which claimant can do light work, the report of Dr. Rowe cannot constitute 'substantial evidence' to support a finding that claimant is able to engage in substantial gainful employment.

"At most, the report of Dr. Rowe can be deemed to constitute 'substantial evidence' to support a finding that claimant can, with interruptions, do light work. Under these circumstances, for claimant to find gainful employment, a job would have to be made for him and we must be realistic enough to understand and appreciate that in the labor market today, jobs are not made for any person. Nothing in the record before the Court suggests that there is any such reasonable possibility available to the claimant.

"On the basis of the composite medical testimony, the uncontradicted testimony of the claimant, the fact that all of the doctors' reports were made at the behest of either the Social Security Administration or claimant's employer's workmen's compensation carrier, and the reasonable interpretation to be made of the report of Dr. Rowe when the entire report is considered, it is evident that there simply is not substantial evidence in the record to support a finding that claimant is capable of doing a type of light work of which there is a reasonable possibility of being employed to do."

In Massey v. Celebrezze, 345 F.2d 146, 155 (C.A. 6), this court said:

"The instant case is similar to Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4) decided January 5, 1965, in which it appeared that the physicians who were intimately familiar with the claimant's medical condition, concluded that he was totally and permanently disabled and impossible to rehabilitate; that, on the other hand, there were assertions of two physicians, hired by the Social Security Administration to evaluate claimant's condition, and that they expressed the view that claimant would be able to work if he could arrange to sit for two four-hour shifts. One of these physicians was most guarded in his answer, stating that he saw no *neurological* reason disqualifying the claimant from such an undertaking; but both of the Administration's physicians frankly admitted 'that because they had no prior knowledge of Cyrus' history and only a limited time in which to examine him, their evaluations might not be entirely accurate.' The court in arriving at a determination of the case, said:

" 'The medical evidence that Cyrus suffers from a disability is uncontradicted. The only conflict is as to the extent of his residual capacity. Normally, it is for the Secretary and not the courts to resolve conflicts in the evidence. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). But where the Secretary places reliance upon one portion of the testimony to the disregard of overwhelming evidence to the contrary, the Secretary's conclusion may not stand. Thomas v. Celebrezze, supra, 4 Cir., 331 F.2d 541.' * * *

"[I]n proving that an applicant is not precluded from performing substantial gainful employment, it is not enough to rely upon testimony that a claimant can do 'light work.' What that light work consists of must be specified."

In Sebby v. Flemming, 183 F.Supp. 450 (D.C.W.D.Ark.), two physicians who had treated the applicant for disability benefits over a period of years stated that he was totally incapacitated, while a physician to whom the applicant had been referred by the Social Security Administration stated that in view of his condition, he would place the applicant in a class "with slight limitation of activity" and "I believe he should be able to do some work." The Hearing Examiner on the evidence of the Social Security Administration held that while the applicant was unable to perform work requiring stress, strain, or heavy physical exertion, it did not appear that he would be precluded from engaging in many types of light or sedentary work, and that the "consultative specialist" expressed the opinion that he should be able to do some work, and that if he could overcome his anxiety, he would get along much more satisfactorily. The Hearing Examiner, accordingly, held that the applicant's impairments "are not of such severity as would continuously preclude him from engaging in any substantial gainful activity * * *." Chief Judge John E. Miller, in reversing the decision of the Secretary and remanding the case for the granting of disability benefits, held that there was no substantial evidence to support the conclusions of the Secretary, and stated: "Two doctors who have treated [applicant] over a period of years advise him not to work and state that he is totally incapacitated. The only evidence in support of the

Referee's findings is the medical report of Dr. Hall, based upon one examination of the plaintiff." In his determination of the case, Judge Miller said:

"After reading and considering the whole of the record, the court does not find that the Referee's conclusions are supported by substantial evidence. It is obvious that the findings of the Referee are based almost exclusively on the medical report of Dr. Hall. However, the court does not find that Dr. Hall's report is sufficient to constitute substantial evidence in the light of the other medical evidence and other facts reflected in the transcript as a whole. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

"In discussing the requirement of a review of the whole record in cases of this type, Professor Davis, in Sec. 29.03 of his recent Treatise on Administrative Law, quotes Professor Jaffe at page 126 of Volume 4 as saying:

"'Obviously responsible men would not exercise their judgment on only that part of the evidence that looks in one direction; the rationality or substantiality of a conclusion can only be evaluated in the light of the whole fact situation or so much of it as appears. Evidence which may be logically substantial in isolation may be deprived of much of its character or its claim to credibility when considered with other evidence.' [Jaffe, Administrative Procedure Re-Examined: The Benjamin Report, 56 Harv.L.Rev. 704, 733 (1954).]"

The three foregoing authorities, Popovich v. Celebrezze, D.C., 220 F.Supp. 205, Massey v. Celebrezze, 6 Cir., 345 F.2d 146, and Sebby v. Flemming, D.C., 183 F.Supp. 450, support the rule which was announced in our court in Mefford v. Gardner, 383 F.2d 748, 761 (1967) (C.A. 6):

"Merely because a physician states that an applicant is not suffering from an impairment that precludes him from engaging in substantial gainful activity; that he has only a slight limitation of activity; and that he should be able to do some work, is not substantial evidence that applicant can engage in substantial gainful activity, when viewed in the light of the evidence of other doctors who had continuously treated applicant, and testified to the contrary, and in the light of the facts reflected in the transcript as a whole."

A determination of a Hearing Examiner based on the evidence of a physician making a single examination, as contrasted with the evidence of a physician who had been treating claimant over a period of years, would not be sustained by substantial evidence. Teague v. Gardner, 281 F.Supp. 43, 48 (E.D.Tenn.N.D.), Miracle v. Celebrezze, 351 F.2d 361, 379 (C.A. 6), Combs v. Gardner, 382 F.2d 949 (C.A. 6), Colwell v. Gardner, 386 F.2d 56, 70, 71 (C.A. 6).

We are of the view that one of the principal reasons for the prejudicial error of the Hearing Examiner is that he relied on isolated remarks in the record as the basis of his findings, rather than on the overwhelming evidence to the contrary. He relied on an isolated statement of Dr. Obenour that claimant might be limited by her pulmonary impairment from performing heavy work but not from performing moderate or light work. He relied on the isolated statement of Dr. Collmann that claimant's gall-bladder disease could be modified by corrective surgery, and that she would not be "restricted" thereafter. Neither of these doctors knew all of claimant's musculoskeletal and joint disorders, which admittedly she had. The Hearing Examiner also relied on an isolated statement that she had "gone off" a diet prescribed for her by Dr. Shea; but he paid no attention to an undisputed statement that the diet she was "on," was approved by Dr. Shea. The Hearing Examiner paid no attention to the voluminous evidence

of claimant's musculoskeletal disorders, or to the undisputed evidence that her diabetes was not controllable. His reason for ignoring all the evidence that showed claimant to be disabled was his view that there was little, if any, clinical evidence to show a medical condition, although we have never had before us, in any case, such a wealth of clinical evidence to show disability.

"This is a classic example of the hearing examiner placing reliance upon one portion of the record to the disregard of overwhelming evidence to the contrary." Thomas v. Celebrezze, 331 F.2d 541 (C.A. 4). "Where the Secretary places reliance upon one portion of the testimony to the disregard of the overwhelming evidence to the contrary, the Secretary's conclusions may not stand." Cyrus v. Celebrezze, 341 F.2d 192, 195 (C.A. 4). "In other words, the findings of the hearing examiner are not supported by substantial evidence when he relies on isolated remarks in one or two medical reports before him." Park v. Celebrezze, 214 F.Supp. 153, 162 (D.C.Ark.) "Moreover, we have long endorsed the rule that clinical medical reports are not of themselves dispositive of the question of claimant's disability, Dillon v. Celebrezze, 345 F.2d 753 (C.A. 4), but fall into an interrelation with other elements, among which are, in the instant case, documented observations by Social Security Administration employees that claimant appeared to be in 'strain and distress' when sitting for just short periods of time. * * *

"In making a determination concerning plaintiff's ability or inability to engage in any substantial gainful activity, consideration must be given not only to the objective medical findings, but also to the subjective evidence of pain and disability as well as plaintiff's educational background, work history, and present age." Mullins v. Finch, 303 F. Supp. 1192, 1197 (D.C.W.Va.).

In the determination of whether a social security claimant for disability benefits is disabled, and unable to engage in any substantial gainful employment, the testimony of lay witnesses is entitled to consideration. Walker v. Gardner, 266 F.Supp. 998 (D.C.Ind.). In the instant case, as heretofore mentioned, the interviewer for the Social Security Administration made a written report stating "that when the claimant came to the District Office to file her claim, 'She seemed to walk with difficulty. * * * When she first sat down, she seemed out of breath. Her left arm seemed to be stiff, and she appeared to have limited use of it. * * * She certainly appeared to be in some noticeable physical distress.' "

In Leath v. Flemming, 191 F.Supp. 577 (D.C.Ala.), the court held that the determination of the Secretary that a claimant who suffered from arthritis so severely that he could not remain standing or sitting for long, could walk only short periods of time, and could drive only very short distances, was not so disabled as to preclude him from performing substantial gainful activity, was not supported by substantial evidence.

The Hearing Examiner in this case made no mention of, and gave no consideration to, claimant's pain, testified to by her, and supported by the medical evidence.

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extra-ordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities." Drafts v. Celebrezze, 240 F.Supp. 535, 538 (D.C.S.C.).

In Miracle v. Celebrezze, 351 F.2d 361, 374 (C.A. 6), this court said:

"If a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration

his age, training, work experience and physical and mental capacities, he is deemed disabled for purposes of the Social Security Act. Smith v. Celebrezze, 229 F.Supp. 827 (D.C.N.C.). Even pain unaccompanied by any objectively observable symptoms, which is nevertheless real to the sufferer and so intense as to be disabling, will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A. 2). * * * The notion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will substantially aggravate a condition, is contrary to law under disability provisions of the Social Security Act which were intended to ameliorate some of the rigors that life imposes. Page v. Celebrezze, 311 F.2d 757 (C.A. 5). The criteria to be considered in determining a claimant's ability or inability to engage in substantial gainful activity, for purposes of determining his right to social security disability benefits, are objective medical facts, diagnoses, and expert medical opinions on subsidiary questions of fact, subjective evidence of pain and disability testified to by claimant, and claimant's educational background, work history and present age. Helton v. Celebrezze, 220 F.Supp. 759 (W.D.N.C.); affirmed 331 F.2d 342 (C.A. 4)."

"As a matter of fact, common experience and observation teach that in many cases of disability pain in one form or another is the chief and immediate disabling agent. An individual's body may be mechanically capable of use and function, but the pain resulting therefrom may be so great as to preclude them. Indeed, the nervous system in an effort to avoid agonizing pain may in effect impose immobility and inactivity upon the person affected; and in such a case the disability is no less real than it would be if the patient had lost the mechanical use of his body." Lewis v. Flemming, 176 F.Supp. 872, 876 (E.D.Ark.).

"We think the examiner so fragmentized Dillon's several ailments and the medical opinions regarding each of them that he failed properly to evaluate their effect in combination upon this claimant." Dillon v. Celebrezze, 345 F.2d 753, 757 (C.A. 4).

The Hearing Examiner held that the fact that the claimant was retired by her company and was awarded retirement benefits based upon disability is not binding on the Secretary or the Hearing Examiner, as it "is of doubtful value as a persuasive factor inasmuch as the test for purposes of compensation, retirement, etc. differ markedly from the disability provisions of the Social Security Act. The Social Security Administration must make its own determination and is not bound by the findings or conclusions of claimant's employer regarding her inability to perform her former duties due to 'disability' as that term is defined under the Retirement Insurance Program of her private employer."

However, the determination of claimant's employer and the employer's insurance carrier that claimant is disabled, and the fact that she was retired with full retirement benefits based on her disability are relevant, entitled to weight and must be considered by the Hearing Examiner, since they are supported by substantial evidence.

Determinations of disability made by non-governmental organizations or by another governmental agency are not binding upon Secretary of Health, Education and Welfare, nor are conclusions of any physician binding as to extent of disability, but such determinations and conclusions are relevant and must be considered when they are supported by substantial evidence. Ihnen v. Gardner, D. C., 253 F.Supp. 541; and it is held that the determination of another governmental agency as to disability of social security disability benefits claimant, while not binding on hearing examiner who must make an independent determination on question of whether claimant is able to engage in any substantial gainful activity, must be given some

weight *and must be considered along with the other evidence, and the hearing examiner should evaluate standards by which claimant was granted the compensation he claimed before such other agency to determine the significance of those standards.* Pendergraph v. Celebrezze, D.C., 255 F.Supp. 313 (1966). In determining disability within the Social Security Act, Secretary is not bound by outside determinations of disability, such as those of claimant's life insurer or those of state agencies, but referee need consider such outside determinations along with other evidence. Stoliaroff v. Ribicoff, D.C., 198 F.Supp. 587. A finding of the Veterans' Administration that claimant was 100% disabled while not binding on Secretary of Health, Education and Welfare on application of claimant for disability benefits, was entitled to weight in evaluating claimant's condition. Mischler v. Celebrezze, D.C., 227 F.Supp. 754.

We are of the view that the fact that claimant's employer paid her salary for months while she was ill and disabled, and afterward both the employer and its insurer retired her with full monthly benefit payments based on her disability, was relevant to her disability under the Social Security Act; was supported by substantial evidence of her disability, and that the Hearing Examiner was obliged under the authorities cited to consider it as evidence of her disability under the Social Security Act.

Dr. Shea's report is undisputed that, due to the multiplicity of her complaints (which he enumerated), during the two years prior to the Hearing Examiner's decision, claimant had a record of absenteeism from her work, and that she could be gainfully employed for only short periods of time, if she could find employment under such circumstances. This kind of employment—intermittent, sporadic, subject to frequent interruptions because of claimant's ailments— does not constitute substantial gainful activity.

On many occasions the courts have determined that intermittent or sporadic activity does not constitute ability to engage in substantial gainful activity, precluding the establishment of disability of a Social Security claimant. In McGaha v. Ribicoff, 262 F.Supp. 161, 163 (D.C.Del.), the court held:

"Only if one is able to perform substantial gainful services with reasonable regularity can he be deemed to be able to engage in substantial gainful activity."

"Slight work of an irregular spasmodic character, subject to frequent interruptions because of Plaintiff's ailment is not substantial gainful activity." Austin v. Celebrezze, 230 F.Supp. 256, 259 (D.C.Tex.). A work record specifically indicating that a claimant was unable to perform her duties or meet production because of ill health, is of great importance when considered with the remainder of the evidence of record. Smith v. Gardner, 251 F.Supp. 262, 268 (D.C. N.C.).

In Paul v. Ribicoff, 206 F.Supp. 606, 612 (D.C.Col.), the court held that:

"But intermittent or sporadic activities do not necessarily bar a claimant from establishing disability when he prefers not to remain idle during the period of his claimed disability. Rather, a claimant's ability to work must be regular and substantial, actual and practical, before he may be said to be able to engage in substantial gainful activity."

In Lightcap v. Celebrezze, 214 F.Supp. 209, 213 (D.C.Pa.), the court said:

"The plaintiff has given evidence of his inability to perform construction work even as a foreman. He has produced evidence of his inability to perform very light work even around the house. But even his statement reported to the Hearing Examiner that he felt he could do light work on some days, as a fact in itself, would not prevent his eligibility for disability insurance benefits. Intermittent, sporadic or infrequent activity does not constitute ability to engage in substantial, gainful activity precluding es-

tablishment of disability under this chapter of the Act."

In McGaha v. Ribicoff, 262 F.Supp. 161, 163 (D.C.Del.), the court said:

"In explaining the concept of 'substantial gainful activity' in hearings on H.R. 7225 (the Social Security Amendments of 1956), the defendant [Secretary] submitted a statement to the Senate Committee on Finance, 84th Cong., 2d Sess., which read (p. 43):

" 'Substantial gainful activity means the performance of substantial services with reasonable regularity * * complete helplessness is not necessary to a finding of an allowable disability. Sporadic or infrequent activity would not necessarily establish ability to engage in substantial gainful activity.' "

In Corn v. Flemming, 184 F.Supp. 490, 493 (D.C.Fla.), the court held that, as pointed out in Lease v. Fleming, D.C., 178 F.Supp. 169, the definition of disability under the Social Security Act "is substantially the same as it was under the old War Risks Claims Act from which a substantial body of authoritative precedent has been established. In a case in the Court of Appeals for the Fifth Circuit, decided under the latter Act, Ross v. United States, 5 Cir., 1931, 49 F.2d 541, 542, it was said:

" '* * * To be able "to follow any substantially gainful occupation," within the practical commonsense meaning of the phrase, *implies ability to work at it all the time. * * *'* (Emphasis supplied.)

"Similarly, following the Ross decision, the Fifth Circuit held that even the ability to engage in ' * * * employment for limited periods does not defeat recovery, if it is reasonably certain that disability beginning while the policy was in force would prevent the insured from *continuously following a substantially gainful occupation.'* " (Emphasis supplied.)

The undisputed evidence was that claimant was able to perform only slight work of an intermittent, irregular, spor-

adic character, subject to frequent interruptions because of her ailments, and was unable to engage in substantial gainful activity; and that she was, therefore, disabled, under the Act, and entitled to disability benefits.

These, then, are the reversible and prejudicial errors of the Hearing Examiner which call for reversal.

The prime error is the holding that the evidence of claimant's attending physician, Dr. Shea, was not supported by objective clinical findings and that, therefore, there was no evidence to support Dr. Shea's findings. This error was followed by the deliberate refusal of the Hearing Examiner to make any mention or give any consideration to the undisputed evidence of claimant's multifarious joint and musculoskeletal disorders that resulted in her many hospitalizations and disability; the repeated holdings that claimant's diabetes was controllable, in the face of the undisputed evidence of claimant's attending physician that for more than two years before the hearing her diabetes was out of control, even with insulin treatment, and that at the final date of the hearing, her diabetes was still uncontrollable; the finding, contrary to the evidence, that all of claimant's musculoskeletal disorders resulted from her diabetes, which was remediable, and that claimant was to blame for her condition because she refused to follow remediable treatment; that, without any evidence to support the finding, the Hearing Examiner concluded that claimant's deteriorated visual impairment resulted from her negligence in failing to remedy her diabetes; the holding that claimant's impaired vision was corrected by glasses, when it appears from the medical evidence that the only vision correctable by glasses was her visual acuity for near and far, and that her vision has been deteriorating for the prior four years, the chief impairment resulting from vertical deviation in the alignment of her eyes causing double vision, none of which was mentioned by the Hearing Examiner; the holding that all of the ailments upon which claimant

alleged disability were remediable; that claimant had not any impairment or impairments in combination severe enough to constitute disability within the meaning of the Act, contrary to the undisputed evidence of her attending physician that due to the multiplicity of her ailments she could engage only in intermittent, sporadic activity for brief periods of time subject to frequent interruptions because of her ailments.

As an instance of the failure of the Hearing Examiner to give consideration to the disabilities of claimant, we are faced with his conclusion that in spite of the deterioration or continually increasing impairment of her vision over a period of several years, and with the vertical deviation in the alignment of her eyes resulting in double vision, claimant could perform the duties of a cashier in a cafeteria or of a nurses' aide in a hospital—both positions requiring unusually good vision.

Moreover, claimant's disability resulted from pain and, in this regard, it has been declared that arthritis, as an instance, produces pain, and that pain is one of its expected symptoms is common knowledge. Richardson v. Ribicoff, 205 F.Supp. 802 (D.C.S.C.). "Where the medical evidence of record before the trier substantially indicates, as it does here, that the ascertainment of the existence of actual disability depends upon determining the truth and reliability of complaints of subjective pain or the medical significance of such complaints once credited, the trier of the fact—whether Examiner or Appeals Counsel—has a duty to pass on that issue." Page v. Celebrezze, 311 F.2d 757, 763 (C.A. 5). No one questions that claimant suffers pain. She testified her pain was so great that she could not continue with her work. There is no medical evidence that suggests that her pain is less than she testified to. On the contrary, the medical evidence shows that she suffered pain and that pain-killing drugs were often prescribed to spare her suffering. The Hearing Examiner seems not to doubt that she told the truth about her pain, but, as the trier of the fact, he had a duty to pass on this issue which he not only failed to do, but never made any mention of "that merciless entity called 'pain'" as Judge Hemphill so eloquently characterized it in Drafts v. Celebrezze, *supra.*

The Hearing Examiner's refusal to pass upon the issue of claimant's pain, caused by her musculoskeletal and joint disorders and resulting in her disability, all of which was supported by credible and uncontradicted evidence, was prejudicial error.

Here, the claimant relied principally on disability because of multiple musculoskeletal impairments. The evidence supported her claim. There was no evidence to dispute her. The only answer of the Hearing Examiner to the undisputed evidence was that the musculoskeletal impairments resulted from claimant's own negligence in not remedying her diabetes! There was no evidence to support such a finding. It was prejudicial error for the Hearing Examiner to refuse to consider the undisputed evidence of claimant's musculoskeletal impairments.

Claimant showed by her attending physician that she was suffering from diabetes that was out of control and had been for at least two years, even with insulin. It was error for the Hearing Examiner to find, without evidence, that claimant was suffering only from "mild diabetes" which was "intermittent."

It was prejudicial error for the Hearing Examiner to find that claimant's impairments of vision were due to her negligence in not following her attending physician's instructions to remedy her diabetes—when there was no evidence that plaintiff's attending physician had ever mentioned claimant's vision as resulting from her negligence in following directions to remedy her diabetes, and never even mentioned claimant's vision.

As heretofore demonstrated, the Hearing Examiner had no basis for his findings that claimant's own attending physician reported that she could do moderate

work on a sustained basis, when the actual evidence showed that claimant's attending physician stated that he believed she could be gainfully employed only *"for short periods of time,"* and, therefore, of course, could not perform substantial gainful activity.

In accordance with the foregoing, the judgment of the District Court should be reversed, and the case remanded with directions to the Secretary to grant the claimed disability benefits.